813 So.2d 155 (2002)
Thomas NAGY and Dawn Nagy, as parents and natural guardians of Ava Katherine Nagy, a minor, Appellants,
v.
FLORIDA BIRTH-RELATED NEUROLOGICAL INJURY COMPENSATION ASSOCIATION, Susan Davila, M.D., and South Broward Hospital District, Appellees.
No. 4D00-4496.
District Court of Appeal of Florida, Fourth District.
March 13, 2002.
Rehearing Denied April 29, 2002.
*156 Wilbur E. Brewton, General Counsel, and Kelly B. Plante of Brewton, Plante & Plante, P.A., Tallahassee, for appellee Florida Birth-Related Neurological Injury Compensation Association.
Nancy W. Gregoire and George E. Bunnell of Bunnell, Woulfe, Kirschbaum, Keller, McIntyre & Gregoire, P.A., Fort Lauderdale, for appellee Susan Davila, M.D.
Ronald A. FitzGerald of Conrad & Scherer, LLP, Fort Lauderdale, for appellee South Broward Hospital District.
HAZOURI, J.
Thomas Nagy and Dawn Nagy, as parents and guardians of Ava Katherine Nagy, who died fourteen hours after birth, appeal from a final order entered by the Division of Administrative Hearings, determining that Ava suffered a "birth-related neurological injury" for which compensation is limited to that provided by the Florida Birth-Related Neurological Injury Compensation Plan ("the Plan"). Appellee, Florida Birth-Related Neurological Injury Compensation Association ("NICA"), was the respondent below. Appellees, Dr. Susan Davila, the obstetrician who delivered Ava, and South Broward Hospital District d/b/a/ Memorial Regional Hospital, the hospital where Dawn Nagy delivered Ava, intervened below.

FACTS
Dawn Nagy arrived at Memorial Regional Hospital on November 20, 1998, at approximately 6:00 A.M. for an induction of labor. At about 5:30 P.M., Dawn began to push. At 8:00 P.M., Dr. Susan Davila, Dawn's obstetrician, noted an arrest of descent and attempted a vacuum assisted delivery. After two unsuccessful pulls, Dr. Davila performed a cesarean section. Ava Katherine Nagy, weighing over 2500 grams, was delivered by cesarean section at 8:43 P.M. Dr. Davila handed Ava to Dr. Afework, the attending neonatologist. Ava was noted as pale, with poor perfusion and with distant heart sounds. Apgar scores[1] were noted as six at one minute and as seven at five minutes.
At 8:52 P.M. Ava was transferred to the neonatal intensive care unit and placed in a preheated isolate. The abnormalities noted included a bruised scalp, boggy occipital area with cephalhematoma,[2] pale mouth and skin and distant heart sounds. Her preliminary diagnosis was hypovolemia, an abnormally decreased volume of circulating plasma in the body. Over the next half-hour, her blood pressure dropped. At 10:30 P.M., the neonatologist, Dr. Afework, *157 diagnosed her as suffering from hypotension/shock, hypovolemia and a subgaleal bleed (bleeding between the skull and scalp). By 10:45 P.M. Ava was in respiratory failure, intubated and placed on a respirator. Subsequent laboratory results revealed internal bleeding. Ava did not respond to various treatments. She continued to deteriorate and bleed internally and by 3:00 A.M. she was in cardiogenic shock.
Ava was placed on extracorporeal membrane oxygenation at 4:50 A.M. However, due to an anticoagulant used to prevent clotting during the procedure, she began to bleed from her mouth, the bleeding in her scalp increased and she began to bleed into her neck. Doctors determined that Ava's condition was terminal and recommended the termination of life prolonging procedures. The Nagys consented and Ava was taken off life support. She was pronounced dead at 10:45 A.M., on November 21, 1998, approximately fourteen hours after she was born. An autopsy was not performed. The death certificate notes that the cause of Ava's death was cardiopulmonary failure due to cardiogenic shock due to an unknown etiology.
The Nagys sent a pre-suit notice to Dr. Davila. The Nagys' medical expert determined that Dr. Davila's treatment of Dawn and Ava fell below the professional standard of care, including negligence in labor management, delivery technique and the administration of medication, which resulted in a failed vacuum extraction, a caesarian section and Ava's death. Dr. Davila informed the Nagys that she was a participant in NICA and any damages were limited by the Plan.
The Nagys filed a petition with the Division of Administrative Hearings for a determination as to whether Ava suffered a "birth-related neurological injury" for which compensation should be awarded under the Plan. Section 766.302(2), Florida Statutes (1997), provides:
"Birth-related neurological injury" means injury to the brain or spinal cord of a live infant weighing at least 2,500 grams at birth caused by oxygen deprivation or mechanical injury occurring in the course of labor, delivery, or resuscitation in the immediate postdelivery period in a hospital, which renders the infant permanently and substantially mentally and physically impaired. This definition shall apply to live births only and shall not include disability or death caused by genetic or congenital abnormality.
The Nagys alleged that the Plan did not apply because Ava did not sustain an injury to her brain during labor, delivery or the immediate post-delivery period. NICA alleged that Ava did suffer a "birthrelated neurological injury" and requested a hearing to determine the compensability of the injury. Dr. Davila and South Broward Hospital District d/b/a Memorial Regional Hospital ("the hospital") were granted leave to intervene.
At the hearing, Dr. Davila's medical records and the hospital's medical records were received into evidence. Transcripts of the depositions of medical experts, Dr. Robert Cullen, Dr. Michael Duchowny and Dr. Charles Kalstone were also received into evidence.
Dr. Robert Cullen's opinion was offered on behalf of the Nagys. His opinion was that the vacuum extractor caused a subgaleal hemorrhage, bleeding between the skull and scalp, which produced "anemia, hypotension, hypo profusion, ischemia, cardiogenic shock, ultimately deprivation of oxygen to the brain and death." He explained that the acidosis and the progressively developing base excess was indicative of brain injury and systemic injury to multiple tissues, but the injury was progressive *158 throughout the 14 hours after the child's birth because the child was losing more and more blood. Dr. Cullen explained that the child did not sustain an injury to the brain in the course of labor, delivery or resuscitation in the immediate post delivery period. The child sustained an injury to the skull and the tissue outside the brain, the area where the bleeding occurred. In his opinion, the events of hypoxia, ischemia and hypo profusion were the result of blood loss and not injury to the brain. He explained that any individual in the process of dying or bleeding will subsequently get brain damage because the entire body is affected. In his opinion, the child did not suffer a NICA compensable injury because the vacuum extractor did not injure the brain.
Dr. Charles Kalstone's opinion was offered on behalf of NICA. He agreed that the vacuum extraction caused a subgaleal hemorrhage and, as a result, the baby suffered from hypovolemia, hypoxia, total system failure, brain damage, heart damage and ultimately death. He acknowledged that the hemorrhage occurred in a layer of the head that is outside the brain. He explained Ava did not have a brain injury at birth. Rather, she had a condition (the subgaleal hemorrhage) which at some point injured the brain. He could not say when the brain injury occurred. Dr. Kalstone determined that the injury was compensable, because the process that ultimately caused Ava's death started at the time the vacuum extractor was used. Dr. Michael Duchowny's opinions were also offered on behalf of NICA and were consistent with Dr. Kalstone's opinions.
In its final order, the Administrative Law Judge (ALJ) found that the experts' opinions were consistent with regards to the nature, cause and timing of Ava's death. He found as follows:
Here, it is not subject to serious debate that, at delivery, Ava received an injury, a subgaleal hemorrhage, caused by the traumatic application of the vacuum extractor and that the hemorrhage continued, and became more critical, resulting in the pathophysiology of events (including hypovolemia, hypoprofusion, hypotension, and the clinical appearance of cardiogenic shock) which followed....
Given the record, it may be resolved that Ava received a mechanical injury (a subgaleal hemorrhage, resulting from the traumatic application of the vacuum extractor) during the course of delivery. The record further reveals that the hemorrhage continued unabated, resulting in hypovolemia, hypotension, hypoprofusion, ischemia, cardiogenic shock, deprivation of oxygen to the brain, systemic collapse, and death. Finally, the record reveals that, while the effects of the hemorrhage may not have produced a significant brain injury during labor or resuscitation in the immediate post-delivery period,[3] brain damage was progressive and became evident at least by midnight, if not by 10:30 p.m., and progressively worsened until a point in time (described by Dr. Cullen as "a point of no return"), prior to Ava's death or her removal from life support, when the injury was so profound that the resulting impairment (mental and physical) could reasonably be described as permanent and substantial.
He noted that what was disputed was the appropriate reading that should be accorded *159 the definition of "birth-related neurological injury." The ALJ determined,
Given the plain and ordinary meaning of the language chosen by the legislature to define "birth-related neurological injury," it must be resolved that, as advocated by NICA and the Intervenors, it is the mechanical injury and not the ultimate consequences of that injury (i.e.: "an injury to the brain ... which renders the infant permanently and substantially mentally and physically impaired"), which must occur during labor, delivery or resuscitation for the claim to be compensable.
Consequently, the ALJ concluded that Ava suffered a "birth-related neurological injury," within the meaning of section 766.302(2), Florida Statutes, and the injury was compensable under the Plan.

ANALYSIS
The Florida Birth-Related Neurological Injury Compensation Plan ("the Plan") was established by our Legislature to provide no-fault compensation for birthrelated neurological injuries to infants. See §§ 766.301-316, Fla. Stat. (1997); Fla. Birth-Related Neurological Injury Comp. Ass'n v. McKaughan, 668 So.2d 974, 978 (Fla.1996). The Legislature's intent was "to provide compensation, on a no-fault basis, for a limited class of catastrophic injuries that result in unusually high costs for custodial care and rehabilitation." § 766.301(2), Fla. Stat. (1997). This case involves the interpretation and application of section 766.302(2), a part of the Plan, which defines "birth-related neurological injury."
"A determination of the administrative law judge as to the qualification of the claim for purposes of compensability under s. 766.309 ... shall be conclusive and binding as to all questions of fact." § 766.311(1), Fla. Stat. (1997). An ALJ's findings of fact are reversible on appeal when they are not supported by competent substantial evidence in the record or where the agency's interpretation of the law is clearly erroneous. See § 120.68(7), (10), Fla. Stat. (1997); Carreras v. Fla. Birth-Related Neurological Injury Comp. Ass'n, 665 So.2d 1082, 1084 (Fla. 3d DCA 1995). An ALJ's interpretation of the Plan is reviewed de novo. See Fluet v. Fla. Birth-Related Neurological Injury Comp. Ass'n, 788 So.2d 1010 (Fla. 2d DCA 2001).
The Nagys do not dispute the ALJ's findings of fact. They dispute the ALJ's interpretation of when the brain injury must occur according to section 766.302(2). The Nagys argue that both the mechanical injury and the injury to the brain, must occur during labor, delivery or resuscitation in the immediate post delivery period for the injury to be a "birth-related neurological injury."
NICA, Dr. Davila and the hospital (collectively, appellees) argue it is the mechanical injury and not the injury to the brain that must occur during labor, delivery or resuscitation in the immediate post delivery period for the injury to be a "birthrelated neurological injury."
The interpretation advocated by the Nagys' would give the Plan a much narrower application. This would be in keeping with the requirement that statutes which are in derogation of the common law be strictly construed and narrowly applied.[4] In interpreting the Plan, this court *160 is guided by the plain language of its statutes and the Legislature's expressed intent. See Fluet, 788 So.2d at 1012; Fla. Birth-Related Neurological Injury Comp. Ass'n v. Fla. Div. of Admin. Hearings, 686 So.2d 1349, 1354 (Fla.1997).
According to the plain meaning of the words as written, the oxygen deprivation or mechanical injury to the brain must take place during labor or delivery, or immediately afterward. All of the experts, including the one retained by NICA, testified that Ava did not suffer oxygen deprivation or a mechanical injury to her brain during labor, delivery or resuscitation in the immediate postdelivery period[5]. They also agreed that she suffered a hemorrhage between her skull and scalp, an area outside her brain. This subgaleal bleeding went undetected, and thus, the baby died of a diminishing blood supply (hypovolemia) which led to a total failure of all of her bodily systems resulting in death. NICA's expert stated that he could not determine when the postdelivery diminution in the blood supply injured the brain.
Because the initial injury was to something other than the baby's brain or spinal cord, by definition, it is not a "birth-related neurological injury" within section 766.302(2). The fact that the subgaleal bleeding ultimately led to cerebral hypoxia and hypovolemia, and this loss of oxygenated blood in turn damaged the brain sometime before death occurred 14 hours from birth, simply means that the deprivation and injury to the brain did not occur during labor or delivery. The fact that a brain injury from oxygen deprivation could be traced back to a mechanical injury outside the brain resulting in subgaleal hemorrhaging does not satisfy the requirement that the oxygen deprivation or mechanical injury to the brain occur during labor or delivery.
To read the statute as broadly as advocated by appellees is to depart from the clearly expressed intention of the legislature that the Plan be limited to a narrow class of catastrophic injuries. The appellees would have us hold that the Plan applies, as long as oxygen deprivation or a mechanical injury occurs during the prescribed time periodno matter how remote the causal link between the oxygen deprivation or mechanical injury and the brain injury or spinal cord injury.
We decline to read the statute that broadly. Ava did not suffer a brain injury upon the application of the vacuum extractor. It was the failure to prevent Ava's continuous blood loss between the skull and scalp that led to the shut down of her organs and brain death from insufficient blood circulating through her body.
There are many non-cranial, mechanical injuries which, if undetected could lead to undiscovered bleeding that will rob the brain of oxygenated blood. Such an expansive reading of the statute does not comport with the expressed legislative intent to limit the Plan's scope. If that were indeed its purpose, we believe the law requires a much plainer statement of such a purpose.
Therefore, we reverse the determination of the ALJ and remand so that the Nagys may pursue their remedies within the judicial system.
Reversed.
FARMER, J., and DELL, JOHN W., Senior Judge, concur.
NOTES
[1] An Apgar score is a numerical expression of the condition of the newborn and reflects the sum total of points gained on an assessment of heart rate, respiratory effort, muscle tone, reflex irritability and color. See Dorland's Illustrated Medical Dictionary 1498 (27th ed.1988).
[2] Cephalhematoma is a subperiosteal hemorrhage on the surface of one cranial bone, a usually benign condition seen in newborns as a result of bone trauma. See Dorland's Illustrated Medical Dictionary 305 (27th ed.1988).
[3] By stating there was no significant brain injury, the ALJ suggests that there was evidence of some brain injury; however, the record reveals that there was no substantial competent evidence before the ALJ that Ava suffered any brain injury during labor, delivery or in the immediate post delivery period.
[4] Because the Plan is a statutory substitute for common law rights and liabilities, it should be strictly construed "to include only those subjects clearly embraced within its terms." Fla. Birth-Related Neurological Injury Comp. Ass'n v. Fla. Div. of Admin. Hearings, 686 So.2d 1349, 1354 (Fla.1997); accord Fluet, 788 So.2d at 1012 n. 4.
[5] The case we face today does not involve resuscitation.