997 So.2d 426 (2008)
ORLANDO REGIONAL HEALTHCARE SYSTEM, INC., etc., Appellant,
v.
FLORIDA BIRTH-RELATED NEUROLOGICAL, etc., Appellee.
No. 5D07-1806.
District Court of Appeal of Florida, Fifth District.
October 31, 2008.
*427 Bradley P. Blystone, of Marshall, Dennehey, Warner, Coleman & Goggin, Orlando, for Appellant.
Wilbur E. Brewton, Kelly B. Plante and Tana D. Storey, of Brewton Plante, P.A., Tallahassee, and Robert J. Grace, Jr., of Stiles, Taylor & Grace, P.A., Tampa, for Appellee, Florida Birth Related Neurological Injury Compensation Association.
HUDSON, M., Associate Judge.
Orlando Regional Healthcare System d/b/a Orlando Regional South Seminole Hospital ("ORHS") appeals a final administrative order dismissing with prejudice a claim for compensation under the Florida Birth-Related Neurological Injury Compensation Plan ("the Plan"), sections 766.301-.316, Florida Statutes (2004). The claim was filed by the survivors of Harper Dean Stever, who died six days after birth. In a final order, the administrative law judge ("ALJ") determined that Harper had not suffered a "birth-related neurological injury," as defined under section 766.302(2), Florida Statutes (2004), since the brain injury did not occur "in the course of labor, delivery, or resuscitation in the immediate postdelivery period. . . ." On appeal, ORHS, which intervened below, disputes the ALJ's findings, contending that they are not supported by competent, *428 substantial evidence. Upon a careful review of the record, we conclude that the ALJ erred as a matter of law in interpreting the statutory language of the Plan and that certain findings were not supported by competent, substantial evidence. Therefore, we reverse.
Mrs. Laura Stever presented to Orlando Regional South Seminole Hospital with complaints of contractions and blood-tinged fluid discharge on October 16, 2004, at 6:00 a.m. At the time, the fetus was at 40 6/7 weeks of gestation. Following admission, Mrs. Stever was given pain medication, and continued monitoring revealed a reassuring fetal heart rate and regular uterine contractions. However, Mrs. Stever subsequently developed a fever and the fetal heart rate had risen to more than 170 beats per minute. Although Mrs. Stever was treated for the fever and fetal tachycardia, the fetal heart rate continued to rise to more than 180 beats per minute with decreasing long-term variability. As a result, Dr. Christopher Quinsey, a "participating physician" under the Plan, decided to proceed with a cesarean section.
At 12:48 p.m., Harper Dean Stever, weighing over 2500 grams, was delivered by cesarean section. At the time of delivery, there were copious amounts of meconium (fetal stool) exuding through the incision at the entry into the uterine cavity. Harper's heart rate was initially noted as less than 100 beats per minute and he was given free-flow oxygen. However, he was not breathing spontaneously, and his heart rate rapidly slowed to 60, requiring an Ambu bag and mask, and chest compressions.
At 12:50 p.m., with Harper's heart rate still 60 beats per minute and his color noted as bluish, a neonatal code was called. During the code, Harper was intubated to provide ventilation, and chest compressions were initiated to establish a sustainable heart rate. His heart rate rose to the 160s and had declined to the 140s by the time the code concluded fifteen minutes later at 1:05 p.m. Manual ventilation continued throughout because Harper was never able to breathe on his own. Harper's Apgar scores[1] were noted as one at one minute, five at five minutes, and as seven at ten minutes. He was hypoglycemic, had a pale pink color, hypotonic tone, depressed activity, and no cry.
At 1:05 p.m., Harper was transferred to the special care nursery. At the special care nursery, resuscitation efforts continued and Harper was assessed and placed on a ventilator, and an umbilical line was started by a pediatrician. The progress notes revealed that while on the ventilator, Harper had oxygen saturations above 95 percent, pale pink color and responses to tactile stimulation. However, due to his acute respiratory failure, it was decided that Harper would be transferred to the neonatal intensive care unit at Arnold Palmer Hospital for Children and Women for continued aggressive resuscitation.
When the Arnold Palmer neonatal transport team took over Harper's care at 1:50 p.m., his oxygen saturation level was 92 percent. However, by 2:30 p.m., he appeared dusky and his oxygen saturation level was 85 percent. A chest X-ray revealed severe lung opacity, which raised a question of edema from meconium aspiration. *429 The transport team continued with resuscitative measures in an effort to stabilize Harper for transport. However, despite aggressive resuscitation measures, Harper's status declined. His oxygen saturation levels and blood pressure dropped, requiring aggressive ambu bagging to sustain his respirations. By the time he arrived at Arnold Palmer Hospital at 5:30 p.m., Harper's color was noted as bluish, and his oxygen saturation levels were in the 50-60s (normal range is 95 or above).
As a result, Harper was placed on high frequency oscillatory ventilation (HFOV) and given medications to increase the function of his lungs, increase his blood pressure and combat metabolic acidosis due to oxygen depletion. Harper's status continued to decline despite these efforts, and he was ultimately placed on extracorporeal membrane oxygenation (ECMO),[2] a heart/lung bypass machine. For the next six days, Harper remained on the ECMO bypass and received anti-seizure treatment due to his frequent seizure episodes. A neurologic evaluation noted that Harper was acidotic with generalized edema, jaundice, no spontaneous movement, boggy scalp, and decreased movement. An Ultrasound Echoencephalogram ultimately confirmed that Harper had experienced an intracranial hemorrhage. Consequently, Harper was taken off the ECMO bypass and died shortly thereafter. The autopsy revealed injury in Harper's brain and lungs.
Harper's mother, as personal representative of Harper's estate, filed a petition with the Division of Administrative Hearings ("DOAH") to determine compensability under the Plan. The DOAH served the Florida Birth-Related Neurological Injury Compensation Association ("NICA") with a copy of the petition. As a party having a substantial interest in the outcome of the proceeding, ORHS was allowed to intervene in this action. Thereafter, NICA responded to the petition, reporting that it had retained Dr. Donald C. Willis to opine whether Harper's claim was compensable under the Plan. According to NICA, Dr. Willis noted that "a fetal infection developed during labor and resulted in respiratory distress and resulting demise," and opined that "[Harper's] intracranial hemorrhage and resulting death were not the result of brain injury that occurred during labor and delivery." At that time, Dr. Willis did not offer any opinion as to whether a brain injury occurred during "resuscitation in the immediate postdelivery period." Based on Dr. Willis's opinion, NICA determined that the claim was not compensable as the injury did not meet the definition of a "birth-related neurological injury," as defined in section 766.302(2), Florida Statutes. As a result, NICA requested a hearing to resolve the issue.
While a hearing was held before the ALJ to determine whether the claim was compensable under the Plan, no live testimony was heard. Instead, the deposition transcripts of Dr. Willis, as well as those of ORHS's experts, Dr. William Rhine and Dr. Charles Brill, were received into evidence. In addition, Harper's and Mrs. Stever's medical records, as well as the fetal monitor strips and autopsy report, were received into evidence.
The Plan was established by the Legislature to provide no-fault compensation for birth-related neurological injuries to infants. See §§ 766.301-.316, Fla. Stat. (1998); Fla. Birth-Related Neurological Injury Comp. Ass'n v. McKaughan, 668 *430 So.2d 974, 978 (Fla.1996). Under the Plan, a "birth-related neurological injury" is an injury to the brain or spinal cord of a live infant caused by oxygen deprivation or mechanical injury "in the course of labor, delivery, or resuscitation in the immediate postdelivery period in a hospital," which renders the infant both permanently and substantially mentally and physically impaired. § 766.302(2), Fla. Stat. (2004). If the infant's injury satisfies this statutory definition, the infant qualifies for financial benefits. Id.; see §§ 766.309, 766.31, Fla. Stat. (2004).
This Court's review of the ALJ's final order is governed by chapter 120, Florida Statutes (2007), the Administrative Procedure Act. See Legal Envtl. Assistance Found., Inc. v. Clark, 668 So.2d 982, 986 (Fla.1996). The ALJ's determination with regard to the qualification of the claim for compensability purposes under the statute is conclusive and binding as to all questions of fact. § 766.311(1), Fla. Stat. (2007). However, an ALJ's final order is reversible on appeal where its interpretation of the law is clearly erroneous or its findings of fact are not supported by competent, substantial evidence. § 120.68(7)(b), (d) & (10), Fla. Stat. (2007); see Carreras v. Fla. Birth-Related Neurological Injury Comp. Ass'n, 665 So.2d 1082, 1084 (Fla. 3d DCA 1995). An ALJ's interpretation of the Plan is reviewed de novo. See Schur v. Fla. Birth-Related Neurological, 832 So.2d 188, 191 (Fla. 1st DCA 2002); Fluet v. Fla. Birth-Related Neurological Injury Comp. Ass'n, 788 So.2d 1010 (Fla. 2d DCA 2001).
Here, the ALJ was required to determine whether Harper suffered a brain injury due to oxygen deprivation or mechanical injury "in the course of labor, delivery, or resuscitation in the immediate postdelivery period in a hospital" that rendered him permanently and substantially mentally and physically impaired. § 766.302(2), Fla. Stat. (2004) (emphasis supplied). On this issue, NICA argued below and on appeal that while Harper required continuous respiratory support since birth, his brain injury postdated the "immediate postdelivery period," and therefore, does not qualify for coverage. NICA relied on the deposition of Dr. Willis, a physician board-certified in obstetrics, gynecology, and maternal-fetal medicine to support this conclusion. ORHS takes the opposite view, arguing that Harper's brain injury occurred "in the immediate postdelivery period" since Harper required continuous respiratory support since birth. In support of its position, ORHS relied on the deposition testimony of Dr. Rhine, a physician board-certified in pediatrics and neonatal-perinatal medicine, and Dr. Brill, a physician board-certified in pediatrics and neurology with special competence in child neurology. Both doctors testified that Harper sustained a brain injury during resuscitation efforts in the immediate postdelivery period, thereby, meeting the statutory definition of a "birth-related neurological injury."
This case hinges on the statutory phrase "resuscitation in the immediate postdelivery period." More importantly, the definition of the term "immediate" is critical in interpreting this phrase. The ALJ found that while Harper had continuous respiratory support throughout his six days of life, his injury did not occur during the "resuscitation in the immediate postdelivery period." This finding is not supported by competent substantial evidence. While this Court must determine the meaning of the term "immediate" in interpreting the phrase "resuscitation in the immediate postdelivery period," the application of this definition in determining plan compensability must be applied on a case-by-case basis. In this case, we find that *431 there is no reasonable interpretation for the phrase "resuscitation in the immediate postdelivery period" that would exclude the injury to Harper.
The statutory phrase "resuscitation in the immediate postdelivery period" is not defined under the Plan. Similarly, the medical experts all acknowledged that this phrase is not defined within the medical community. Still, they all agreed that this period would last until the infant was stabilized, although they each had a different opinion as to when Harper was stabilized. Dr. Rhine, whom the ALJ found to be most credible, and Dr. Brill agreed that Harper was not stabilized until he went on the ECMO bypass hours after his birth. Even Dr. Willis stated that the "immediate" period would end at the time of the ten-minute Apgar test, while opining that it was "pretty clear" that Harper was not going to stabilize at the time of that test. Nevertheless, the ALJ ignored the experts' analysis of what "immediate" meant in this case because that term did not have an established medical definition.[3] Applying de novo review, we hold that the ALJ erred, as a matter of law, in applying the language of the statute to exclude Harper's injury from the resuscitation that took place in the "immediate postdelivery period."
Under the Plan, the terms "resuscitation" and "immediate" are important qualifiers to determining the compensability of a claim. However, those terms are not defined by the statute. When a term is not defined within a statute, a fundamental construction tool requires giving a statutory term its "plain and ordinary meaning." Green v. State, 604 So.2d 471, 473 (Fla.1992); Dianderas v. Fla. Birth Related Neurological, 973 So.2d 523, 527 (Fla. 5th DCA 2007). When necessary, the plain and ordinary meaning can be ascertained by reference to a dictionary. Green, 604 So.2d at 473; see also L.B. v. State, 700 So.2d 370, 372 (Fla.1997) (explaining that "court may refer to a dictionary to ascertain the plain and ordinary meaning"). This Court has previously utilized references to dictionaries and medical references to interpret other provisions of the statute. See, e.g., Dianderas, 973 So.2d at 527.
The American Heritage Dictionary defines the term "resuscitate" as "[t]o return to consciousness, vigor or life; revive." The American Heritage Dictionary 1054 (2d ed. 1985). Dorland's Illustrated Medical Dictionary similarly defines "resuscitation" as "the restoration to life or consciousness of one apparently dead; it includes such measures as artificial respiration and cardiac massage." Dorland's Illustrated Medical Dictionary 1145 (26th ed. 1981). Further, "immediate" is commonly understood to mean "[n]ext in line or relation[;] . . . [o]ccuring without delay[;][o]f or near the present time[;] . . . [c]lose at hand; near." The American Heritage Dictionary 643 (2d ed. 1985); see *432 Merriam-Webster's Collegiate Dictionary 578 (10th ed. 2000) (defining "immediate" as "being next in line or relation[;] . . . existing without intervening space or substance[;]. . . being near at hand[;] . . . occurring, acting, or accomplished without loss or interval of time[;] . . . near or related to the present").
The ALJ reviewed both the plain meaning of "resuscitate" and "immediate," but limited the "resuscitation in the immediate postdelivery period" to only the first resuscitation necessarily performed on Harper as a result of the code called. However, in looking at the definition of "resuscitate," it includes measures such as artificial respiration. In this case, although the code ended at 1:05 p.m., Harper continued to suffer respiratory failure that required artificial respiration. He could not breathe on his own and required active resuscitation continuously until he was placed on the ECMO bypass. It is not logical to find that "immediate" only means through the first resuscitative attempt when Harper was initially revived but no spontaneous respirations could otherwise be established. Harper continued to need resuscitation, without interruption, and that ongoing need creates one time period  the "immediate postdelivery period."
Further, the ALJ failed to apply the statutory presumption favoring compensability for this claim. If a claimant establishes that the infant sustained a brain or spinal cord injury caused by oxygen deprivation or mechanical injury and the infant was permanently and substantially mentally and physically impaired, a rebuttable presumption arises that the injury is a birth-related neurological injury. § 766.309(1)(a), Fla. Stat. (2007). Clearly, Harper experienced a brain injury caused by oxygen deprivation and, therefore, the presumption applied. Applying our interpretation of "resuscitation in the immediate postdelivery period" to include the period that Harper needed ongoing and active resuscitation efforts continuously after his birth, the ALJ's findings of fact excluding Harper's neurological injury from the Plan cannot be supported by competent, substantial evidence. The presumption that Harper's injury is a birth-related neurological injury cannot be rebutted based on the record.
The undisputed facts, expert testimony, and medical records support a finding that Harper's brain injury occurred as a result of oxygen deprivation between the time of birth and the time of being placed on the ECMO bypass. The testimony of Dr. Rhine, upon which the ALJ primarily relied, established that Harper began to suffer hypoxic ischemic brain damage due to low oxygen saturation levels and low blood pressure from the time of the initial resuscitation effort following his birth and the attempted period of stabilization, including ongoing resuscitation due to Harper's respiratory failure, up until the point he was placed on the ECMO bypass. While Dr. Rhine opined that Harper did not suffer a brain injury during the actual labor and delivery, it was his opinion that Harper did suffer a brain injury in the period from the resuscitation effort initiated after his birth until he was placed on the ECMO bypass. Having found that this period was within the "immediate postdelivery period," there can be no other conclusion than the claim is compensable under the Plan.
Accordingly, we reverse the determination of the ALJ, and remand for entry of an order finding that the claim filed by Harper's estate is subject to compensation under the Plan.
REVERSED and REMANDED.
LAWSON and COHEN, JJ., concur.
NOTES
[1] An Apgar score is a numerical expression of the condition of the newborn and reflects the sum total of points gained on an assessment of heart rate, respiratory effort, muscle tone, reflex irritability and color. Nagy v. Fla. Birth-Related Neurological Injury Comp. Ass'n, 813 So.2d 155, 159 n. 1 (Fla. 4th DCA 2002) (citing Dorland's Illustrated Medical Dictionary 1498 (27th ed. 1988)). The scores help the physician decide what resuscitative efforts may be required for the newborn.
[2] ECMO is a treatment method for critically ill newborns whose lungs are unable to provide sufficient oxygenation of the blood. ECMO therapy acts as an artificial heart and lung to oxygenate the baby's blood.
[3] An ALJ is not required to consider expert testimony on any issue if it amounts to a conclusion of law. Section 766.304 grants an ALJ exclusive jurisdiction to determine whether a claim is compensable under the Plan. In making this determination, an ALJ may allow expert testimony to aid in the interpretation of an administrative rule if that testimony will assist the trier of fact in understanding the evidence or in determining a fact in issue. §§ 90.702, 90.703, Fla. Stat. (2007). This type of testimony is allowed in order to explain the character of an object so as to determine if it complies with a statute, ordinance, or code. Noa v. United Gas Pipeline Co., 305 So.2d 182, 185-86 (Fla. 1974); Seibert v. Bayport Beach & Tennis Club Ass'n, 573 So.2d 889, 891 (Fla. 2d DCA 1990). In this case, the expert witnesses' testimony was limited to matters of fact, as distinguished from matters of law, and therefore, the ALJ should have considered the experts' analysis of what "immediate" meant in this case.