WALLACE, Judge.
 

 In. these consolidated appeals, Christine Hilderbrandt (Nurse Hilderbrandt); Tarpon Springs Hospital Foundation, Inc., d/b/a Helen Ellis Memorial Hospital (the Hospital); and the Florida Birth-Related Neurological Injury Compensation Association (NICA) challenge the final order in which an administrative law judge (ALJ) determined that Nurse Hilderbrandt was not a participating physician under the Florida Birth-Related Neurological Injury Compensation Plan (the Plan) and that the Hospital failed to comply with the notice provisions of the Plan. We conclude that the ALJ erred in finding that Nurse Hil-derbrandt was not a participating physician under the Plan but correctly ruled that the Hospital failed to comply with the notice provisions of the Plan. Accordingly, we affirm in part, reverse in part, and remand with instructions to modify the final order consistent with this opinion.
 

 I. THE FACTS AND PROCEDURAL HISTORY
 

 Allison Anderson and Timothy Anderson are the natural parents of a male child born at the Hospital on July 29, 2004. During the child’s delivery, Mrs. Anderson was treated by Dr. Matthew Conrad and Nurse Hilderbrandt. Dr. Conrad and Nurse Hilderbrandt were employees of the Hospital at all relevant times. Dr. Conrad was a participating physician under the Plan. In addition, NICA sent Nurse Hil-derbrandt a certificate for the year 2004 for her participation under the Plan. However, as discussed below, whether Nurse Hilderbrandt was a participating physician under the Plan was a disputed issue before the ALJ.
 

 Mrs. Anderson received her prenatal care at West Coast Medical Group, Inc., d/b/a West Coast Obstetrics & Gynecology (West Coast OB/GYN).
 
 [1]
 
 During Mrs. Anderson’s initial prenatal visit on December 12, 2003, she was given a NICA brochure titled
 
 Peace of Mind for an Unexpected Problem
 
 and an acknowledgment form that stated, in pertinent part, as follows:
 

 I have been furnished information by [West Coast OB/GYN], prepared by [NICA], and have been advised that M.
 
 *745
 
 Conrad MD ... and Christine Hilder-brandt CNM, are participating providers in that program, wherein certain limited compensation is available in the event certain neurological injury may occur during labor, delivery or resuscitation. For specifics on the program, I understand I can contact [NICA], P.O. Box 14567, Tallahassee, Florida 32317-4567, 1-800-398-2129. I further acknowledge that I have received a copy of the brochure by NICA.
 

 Mrs. Anderson signed and dated the form.
 

 On June 24, 2004, the Andersons went to the Hospital to preregister for the delivery of their son. They were interviewed by a registration clerk, who entered the Andersons’ demographic, employment, insurance, and delivery information (physician’s name and due date) into a computer. Although the ALJ expressly found that it would have been practicable to have done so, the registration clerk did not provide the Andersons with an acknowledgment form or a NICA brochure.
 

 Mrs. Anderson did not return to the Hospital until early on the morning of July 28, 2004. Upon her arrival at the Hospital, Mrs. Anderson signed an acknowledgment form that stated, in pertinent part, as follows:
 

 I have been furnished information by [the Hospital] prepared by [NICA], and have been advised that [the Hospital] participates in that program, wherein certain limited compensation is available in the event certain neurological injury may occur during labor, delivery, or resuscitation. I understand that for specifics on the program I can contact [NICA] as described in the brochure prepared by NICA titled
 
 Peace of Mind, for an Unexpected Problem.
 
 I further acknowledge that I have received a copy of the brochure.
 

 Mrs. Anderson was diagnosed with false labor and discharged with a prescription for a sleeping aid and instructions to rest. Mrs. Anderson returned home and slept for the remainder of the day.
 

 Mrs. Anderson returned to the Hospital on July 29, 2004. She signed another acknowledgment form identical to the one she had signed the previous day. The nurse on duty at the Hospital called Nurse Hilderbrandt, who gave orders to monitor Mrs. Anderson. Nurse Hilderbrandt later arrived at the Hospital and examined Mrs. Anderson. Nurse Hilderbrandt called Dr. Conrad, who authorized augmentation of labor. Approximately nine hours later, Mrs. Anderson was moved to the operating room where Dr. Conrad performed an emergency cesarean section. At delivery, the child was not breathing. The child was resuscitated but suffered a birth-related neurological injury.
 

 In 2007, the Andersons filed a complaint in the circuit court against Nurse Hilder-brandt, the Hospital, West Coast OB/GYN, and two other defendants. The circuit court proceedings were abated for a determination by the Division of Administrative Hearings concerning whether the child’s injuries were covered by the Plan. The Andersons filed a petition -with NICA. Subsequently, Nurse Hilderbrandt, the Hospital, Dr. Conrad, and other health care providers working at West Coast OB/ GYN were granted leave to intervene. NICA determined that the neurological injury for which the parents were seeking redress was compensable under the Plan and requested a formal administrative hearing before an ALJ.
 

 A final administrative hearing was conducted in April 2008. At that hearing, Nurse Hilderbrandt, the Hospital, Dr. Conrad, and the other health care providers working at West Coast OB/GYN sought to establish the compensability of
 
 *746
 
 the claim, their compliance with the notice provisions of the Plan, and their entitlement to immunity under the Plan.
 
 [2]
 
 Nurse Hilderbrandt submitted a seventy-page document titled
 
 West Coast Obstetrics & Gynecology, Certified Nurse Midwife Protocol
 
 (the Guidelines). She submitted an “edit copy” that contained numerous handwritten notes because she did not have a copy of the final draft of the Guidelines.
 
 [3]
 
 The Guidelines addressed multiple situations that Nurse Hilderbrandt was called upon to handle in the course of her practice with West Coast OB/GYN. Nurse Hilderbrandt testified that she was familiar with the Guidelines and used them in the course of her practice on a daily basis.
 

 In addition, Nurse Hilderbrandt testified that she signed protocols that were filed yearly with the Board of Nursing as required by chapter 464, Florida Statutes, and Florida Administrative Code Rule 64B9-4.010. Nurse Hilderbrandt described these protocols as “an outline” of the more detailed Guidelines that she submitted at the hearing. However, Nurse Hilder-brandt did not introduce into evidence a copy of the protocols she filed with the Board of Nursing. She explained that she did not have a copy, and she entered into evidence a letter from the Board of Nursing indicating that the protocol she filed in 2004 could not be located.
 

 In his written final order, the ALJ found that Dr. Conrad and the other health care providers working at West Coast OB/GYN were participating physicians under the Plan and had complied with the notice requirements. The ALJ also found that Nurse Hilderbrandt had filed protocols with the Board of Nursing. Nevertheless, the ALJ concluded that she “failed to establish that [she] was a ‘participating physician’ at the time of [the child’s] birth” because she could not produce the final draft of the Guidelines or the protocols that she had filed with the Board of Nursing to prove that the prearranged plan of treatment required by section 766.314(4)(c), Florida Statutes (2004), existed.
 

 In his written final order, the ALJ also found that if Mrs. Anderson’s contacts with the Hospital on July 28 and 29, 2004, were the only contacts she had with the Hospital, “it would likely be concluded that it was not practicable to have given notice earlier.” However, the ALJ ruled that “since Mrs. Anderson pre-registered for the delivery ... on June 24, 2004, and she was not provided a NICA notice or brochure, ... it must be resolved on the facts of this case that the [H]ospital failed to comply with the notice provisions of the Plan.” The ALJ declined to address the issue of immunity.
 
 [4]
 
 Nurse Hilderbrandt,
 
 *747
 
 the Hospital, and NICA appeal from this final order.
 

 II. STANDARD OF REVIEW
 

 We “will not disturb the ALJ’s findings of fact unless they are not supported by competent substantial evidence.”
 
 Univ. of Miami v. Ruiz,
 
 916 So.2d 865, 868 (Fla. 3d DCA 2005). However, we review de novo the ALJ’s interpretation of the Plan.
 
 See Fla. Birth-Related, Neurological Injury Comp. Ass’n v. Fla. Div. of Admin. Hearings,
 
 948 So.2d 705, 709-10 (Fla.2007). We are authorized to set aside or modify the ALJ’s final order if we find that the ALJ’s interpretation of the Plan is erroneous.
 
 Romine v. Fla. Birth Related Neurological Injury Comp. Ass’n,
 
 842 So.2d 148, 150 n. 4 (Fla. 5th DCA 2003);
 
 Gugelmin v. Div. of Admin. Hearings,
 
 815 So.2d 764, 767 (Fla. 4th DCA 2002);
 
 see
 
 § 120.68(7)(d), Fla. Stat. (2004) (“The court shall remand a case ... or set aside agency action, as appropriate, when it finds that ... [t]he agency has erroneously interpreted a provision of law and a correct interpretation compels a particular action. ...”).
 

 III. NURSE HILDERBRANDT’S PREARRANGED PLAN OF TREATMENT
 

 A. The Parties’Arguments
 

 Nurse Hilderbrandt and NICA contend that the ALJ ignored the plain language of section 766.314(4)(c) and instead “created additional and burdensome requirements that do not exist.” They argue that the ALJ improperly required proof of a written protocol to establish the existence of the prearranged plan of treatment required by section 766.314(4)(c). In response, the Andersons claim that the ALJ correctly interpreted section 766.314(4)(c) as requiring proof of a written protocol because the Nurse Practice Act, §§ 464.001-.027, Fla. Stat. (2004), and rule 64B9-4.010 permit certified nurse midwives to practice only if they are supervised by a licensed physician and governed by a written protocol filed with the Board of Nursing.
 

 B. The ALJ’s Interpretation of Section 766.314
 

 The Plan treats certified nurse midwives as “participating physicians” if two conditions are met. First, nurse midwives must pay “50 percent of the physician assessment required by [the Plan].” § 766.314(4)(c). Second, they must be “supervised by a participating physician who has paid the assessment required by [the Plan].”
 
 Id:
 

 [5]
 

 Under the Plan, “[supervision for nurse midwives shall require that the supervising physician will be easily available and have a prearranged plan of treatment for specified patient problems which the supervised certified nurse midwife may carry out in the absence of any complicating features.”
 
 Id.
 

 The ALJ found that Nurse Hilderbrandt had paid the required assessment and that she was supervised by a participating physician who would be easily available. But the ALJ ruled that Nurse Hilderbrandt did not have a prearranged plan of treatment based on her “failure to offer the [written] protocols she claimed were in place.” The ALJ interpreted section 766.314(4)(c) to require proof that the prearranged plan of treatment was reduced to writing. We conclude that the ALJ’s interpretation of section 766.314(4)(c) was erroneous.
 

 
 *748
 
 The supreme court teaches that “[w]hen the language of the statute is clear and unambiguous and conveys a clear and definite meaning, there is no occasion for resorting to the rules of statutory interpretation and construction; the statute must be given its plain and obvious meaning.”
 
 Holly v. Auld,
 
 450 So.2d 217, 219 (Fla. 1984) (alteration in original) (quoting
 
 A.R. Douglass,
 
 Inc.
 
 v. McRainey,
 
 102 Fla. 1141, 137 So. 157, 159 (1931)). Courts are “without power to construe an unambiguous statute in a way which would extend, modify, or limit, its express terms or its reasonable and obvious implications. To do so would be an abrogation of legislative power.”
 
 Id.
 
 (emphasis omitted) (quoting
 
 Am. Bankers Life Assurance Co. of Fla. v. Williams,
 
 212 So.2d 777, 778 (Fla. 1st DCA 1968)).
 

 The ALJ interpreted “prearranged plan of treatment” as a written document. However, the plain language of section 766.314(4)(c) does not indicate that the prearranged plan of treatment must be in writing. The term “prearranged plan of treatment” is not defined by the statute or the case law. “When necessary, the plain and ordinary meaning of words can be ascertained by reference to a dictionary.”
 
 Seagrave v. State,
 
 802 So.2d 281, 286 (Fla.2001). The dictionary definitions of the words “prearrange,”
 
 [6]
 
 “plan,”
 
 [7]
 
 and “treatment”
 
 [8]
 
 do not lend support to the ALJ’s interpretation of the statute as requiring a written document. Thus, based on the plain language of section 766.314(4)(c), a “prearranged plan of treatment” is not required to be a written document.
 

 The Andersons’ argument that section 766.314(4)(c) should be interpreted in light of the Nurse Practice Act and rule 64B9-4.010 is unpersuasive for two reasons. First, the Nurse Practice Act and rule 64B9-4.010 should not be used to ascertain the plain and ordinary meaning of “prearranged plan of treatment.” “In the absence of a statutory definition, resort may be had to case law or related statutory provisions which define the term....”
 
 Jones v. Williams Pawn & Gun, Inc.,
 
 800 So.2d 267, 270 (Fla. 4th DCA 2001) (citing
 
 State v. Barnes,
 
 686 So.2d 633, 637 (Fla. 2d DCA 1996)). In
 
 Cason v. Florida Department of Management Services,
 
 944 So.2d 306, 308 (Fla.2006), the supreme court interpreted the term “taxpayer” as used in section 194.171, Florida Statutes (2006). Because section 194.171 did not define “taxpayer,” the supreme court looked at the definition of “taxpayer” in section 192.001(13), Florida Statutes (2006). 944 So.2d at 313. Here, unlike in
 
 Cason,
 
 the ALJ could not use the Nurse Practice Act or rule 64B9^4.010 for guidance when interpreting section 766.314(4)(c) because the Nurse Practice Act and the rule do not define the term “prearranged plan of treatment.”
 
 See
 
 § 464.003; Fla. Admin. Code R. 64B9-4.010.
 

 Second, the Plan could not be read
 
 in pari materia
 
 with the Nurse Practice Act or rule 64B9-4.010. The Plan does not reference the Nurse Practice Act or the
 
 *749
 
 rule.
 
 See
 
 §§ 766.301-.316. Furthermore, the Plan, the Nurse Practice Act, and rule 64B9-4.010 do not relate to the same subject matter or share the same purpose. The Plan governs the exposure to civil liability of hospitals and physicians providing obstetrical services,
 
 see
 
 §§ 766.301-.316, and its purpose “is to limit a participating physician’s exposure to civil liability in cases where the doctor’s professional involvement could make him or her a defendant in a lawsuit,”
 
 Fluet v. Fla. BirthRelated Neurological Injury Comp. Ass’n,
 
 788 So.2d 1010, 1012 (Fla. 2d DCA 2001). In contrast, the Nurse Practice Act is concerned with the regulation of the nursing profession and its purpose “is to ensure that every nurse practicing in this state meets minimum requirements for safe practice.” § 464.002. “Rule 64B9-4.010 ... sets minimum standards for protocols pursuant to which an [advanced registered nurse practitioner] performs medical acts identified and approved by the joint committee pursuant to” the Nurse Practice Act. Fla. Admin.Code R. 64B9-4.008. Because the Plan, the Nurse Practice Act, and rule 64B9-4.010 do not relate to the same subject matter or share the same purpose, the ALJ could not construe them together to require proof of a written “prearranged plan of treatment.”
 
 See State v. Mason,
 
 979 So.2d 301, 303 (Fla. 5th DCA 2008) (“A law should be construed together with any other statute relating to the same subject matter or having the same purpose if they are compatible.”).
 

 The ALJ erroneously interpreted section 766.314(4)(c) as requiring proof of a written document to demonstrate that the doctor supervising Nurse Hilderbrandt “ha[d] a prearranged plan of treatment for specified patient problems.” A correct interpretation of that section compels a finding that a prearranged plan of treatment existed because (1) Nurse Hilderbrandt presented unrefuted evidence of the course of action she was authorized to follow when caring for a patient and (2) the ALJ acknowledged that the nurse filed a protocol
 
 [9]
 
 with the Board of Nursing for the year 2004. Because Nurse Hilderbrandt paid the required assessment, was supervised by a participating physician that was easily available, and had a prearranged plan of treatment, we conclude that she was a participating physician under the Plan.
 

 IV. THE HOSPITAL’S COMPLIANCE WITH THE PLAN’S NOTICE PROVISIONS
 

 A. The Parties
 
 ’
 
 Arguments
 

 The Hospital raises three arguments with respect to the issue of its compliance
 
 *750
 
 with the Plan’s notice provisions. First, the Hospital asserts that it gave proper and timely notice to Mrs. Anderson in 2001 during her earlier pregnancy with another child. Second, the Hospital argues that notice was not practicable when Mrs. Anderson appeared at the Hospital for preregistration on June 24, 2004. Accordingly, the notices given to Mrs. Anderson when she presented herself at the Hospital in false labor on July 28, 2004, and for delivery on the following day were effective because those notices were given as soon as practicable. Third, the Hospital claims that the notice Mrs. Anderson received on December 12, 2003, obviated the need for any further notice by the Hospital for two reasons: (1) based on general agency principles, the Hospital provided notice through its employees and (2) any further notice by the Hospital would have been meaningless under this court’s decision in
 
 Bayfront Medical Center, Inc. v. Florida Birth-Related Neurological Injury Compensation Ass’n,
 
 982 So.2d 704 (Fla. 2d DCA 2008),
 
 quashed sub norm Florida Birth-Related Neurological Injury Compensation Ass’n v. Department of Administrative Hearings,
 
 29 So.3d 992 (Fla.2010). With the exception of the argument about the efficacy of the Hospital’s notice that was delivered during Mrs. Anderson’s prior pregnancy, NICA makes similar arguments.
 

 B. Notice Requirements for Hospitals under the Plan
 

 The Plan’s notice provision states, in pertinent part, as follows:
 

 Each hospital with a participating physician on its staff and each participating physician ... under the [Plan] shall provide notice to the obstetrical patients as to the limited no-fault alternative for birth-related neurological injuries. ... Notice need not be given to a patient when the patient has an emergency medical condition ... or when notice is not practicable.
 

 § 766.316. The supreme court has explained that “health care providers must, when practicable, give their obstetrical patients notice of their participation in the [P]lan a reasonable time prior to delivery.”
 
 Galen of Fla., Inc. v. Braniff,
 
 696 So.2d 308, 309 (Fla.1997). The purpose of the notice is to permit patients to decide whether to use health care providers that participate in the Plan or to preserve their civil remedies by using providers that are not participants.
 
 Id.
 
 at 309-10.
 

 The Supreme Court of Florida has very recently interpreted the notice requirements of section 766.316 as follows:
 

 [BJoth
 
 participating physicians and hospitals with a participating physician on staff are required to provide notice to obstetrical patients of their rights and limitations under the plan. The plain language of section 766.316 does not, in any way, suggest that when a participating physician provides notice of his participation in the plan, the notice requirement has been satisfied.
 

 Florida Birth-Related,
 
 29 So.3d at 998. Thus “the statute requires
 
 both
 
 participating physicians and hospitals with participating physicians on staff to provide obstetrical patients with notice of their rights and limitations under the plan.”
 
 Id.
 

 In addition, the requirement of notice is severable with regard to the liability of the participating physician and the hospital:
 

 [I]f either the participating physician or the hospital with participating physicians on its staff fails to give notice, then the claimant can either (1) accept NICA remedies and forgo any civil suit against any other person or entity involved in the labor or delivery, or (2) pursue a civil suit only against the person or enti
 
 *751
 
 ty who failed to give notice and forgo any remedies under NICA.
 

 Id.
 
 Thus the persons or entities that gave proper and timely notice are shielded from civil liability, and a claimant who did not receive proper and timely notice may pursue civil remedies only against the person or entity who failed to provide such notice.
 
 Id.
 

 C. Discussion
 

 Our supreme court’s very recent decision in
 
 Florida Birth-Related
 
 has resolved against the Hospital and NICA and in favor of the Andersons the question of whether the statute requires both participating physicians and hospitals with participating physicians on staff to provide obstetrical patients with notice of their rights under the Plan.
 
 Florida Birth-Related,
 
 29 So.3d 992,. Thus we need not address the third argument. Instead, we now consider the first argument concerning the efficacy of the Hospital’s notice given during an earlier pregnancy and the second argument addressing the practicability of giving notice at preregistration.
 

 1. The Notice Given During an Earlier Pregnancy
 

 The ALJ rejected the Hospital’s argument that notice given to Mrs. Anderson in 2001, during an earlier pregnancy, satisfied the notice requirements of the Plan. The ALJ concluded that a separate notice was required with respect to each pregnancy. We agree.
 

 Section 766.316 requires “[e]ach hospital with a participating physician on its staff’ to “provide notice to the obstetrical patients as to the limited no-fault alternative for birth-related neurological injuries.” Section 766.302(7) defines the term, “participating physician” as
 

 a physician licensed in Florida to practice medicine who practices obstetrics or performs obstetrical services either full time or part time and who had paid or was exempted from payment
 
 at the time of the injury
 
 the assessment required for participation in the birth-related neurological injury compensation plan
 
 for the year in which the injury occurred.
 

 (Emphasis added.) Thus a physician’s right to assert the exclusive remedies of the Plan turns on whether he or she qualified as a “participating physician” at the time of the injury.
 
 See id.; see also
 
 § 766.309(1)(b). Further, a hospital’s obligation to give notice under the statute may vary from year to year depending on whether the Hospital has a “participating physician” on its staff.
 

 Because the time of the injury is the critical factor for determining the claimant’s entitlement to benefits and the health care provider’s right to assert the exclusive remedies of the Plan and because a hospital’s obligation to give notice may vary from year to year, the statutory scheme necessarily contemplates that separate notice be given to each obstetrical patient for each pregnancy. It follows that reliance on a notice given to an obstetrical patient during an earlier pregnancy is inconsistent with the statutory scheme.
 

 We also observe that this argument by the Hospital leads to absurd results. Here, the prior notice was given to Mrs. Anderson during a pregnancy occurring only three years earlier. Whether Mrs. Anderson or any other obstetrical patient would remember the contents of a legal notice received during a pregnancy three years before is questionable. But it would certainly stretch the bounds of reason to the breaking point to assert that a notice given to an obstetrical patient ten years before her current pregnancy could constitute effective notice under the Plan. How
 
 *752
 
 ever, this is the conclusion to which the Hospital’s argument inevitably leads. Undeniably, both the statutory framework and common sense require that a separate notice be given to an obstetrical patient for each pregnancy.
 

 2. The Practicability of Giving Notice at Preregistration
 

 Mrs. Anderson appeared personally at the Hospital for preregistration on June 24, 2004, a little over one month before her delivery. It is undisputed that the Hospital did not provide the NICA notice or brochure to Mrs. Anderson when she preregistered. In fact, the earliest date that the Hospital provided Mrs. Anderson with the NICA notice and brochure was on July 28, 2004, when she presented at the Hospital and was sent home, one day before her actual delivery. The ALJ expressly found that it would have been practicable for the Hospital to have provided Mrs. Anderson with the NICA notice and brochure at preregistration on June 24, 2004.
 

 Whether a health care provider was able to give an obstetrical patient pre-delivery notice of participation and whether notice was given a reasonable time before delivery are questions of fact to be determined on a case-by-case basis.
 
 Galen,
 
 696 So.2d at 311;
 
 Weeks v. Fla. Birth-Related Neurological Injury Comp. Ass’n,
 
 977 So.2d 616, 620 (Fla. 5th DCA 2008). The ALJ’s findings of fact are not subject to reversal if they are supported by competent, substantial evidence.
 
 See Nagy v. Fla. Birth-Related Neurological Injury Comp. Ass’n,
 
 813 So.2d 155, 159 (Fla. 4th DCA 2002) (citing § 120.68(7), (10), Fla. Stat. (1997)). “A determination of the administrative law judge as to the qualification of the claim for purposes of compensa-bility ... shall be conclusive and binding as to all questions of fact.” § 766.311(1).
 

 The Appellants’ argument on this point amounts to an attack on the ALJ’s factual finding that it was practicable for the Hospital to have given notice to Mrs. Anderson during the preregistration process, a little over one month before her delivery. The Hospital explains in considerable detail why its policies, practices, and procedures for the preregistration process in effect in 2004 did not include the delivery of the NICA notice and brochure to obstetrical patients. However, the Hospital’s policy of not providing the NICA notice and brochure to obstetrical patients at preregistration does not mean that it was not practicable for the Hospital to have done so. Several reported decisions recognize that the preregistration by an obstetrical patient at a hospital is an appropriate occasion for the hospital to give the patient notice of participation in the Plan a reasonable time before delivery.
 
 See Weeks,
 
 977 So.2d at 619;
 
 Nw. Med. Ctr. v. Ortiz,
 
 920 So.2d 781, 784-85 (Fla. 4th DCA 2006);
 
 Univ. of Miami v. Ruiz,
 
 916 So.2d 865, 868-69 (Fla. 3d DCA 2005).
 

 In this case, the ALJ’s finding of fact that it would have been practicable for the Hospital to give predelivery notice of participation at preregistration is not undermined by the Hospital’s decision to adopt policies, practices, and procedures for preregistration that did not include such notice. After a thorough review of the record, we conclude that the ALJ’s finding of fact is a binding determination because it is supported by competent, substantial evidence.
 

 The notice requirement of section 766.316 is easily satisfied. Construing section 766.316, the supreme court has stated: “[I]n order to preserve their immune status, NICA participants who are in a position to notify their patients of their participation a reasonable time before delivery simply need to give the notice in a timely
 
 *753
 
 manner.”
 
 Galen,
 
 696 So.2d at 311. In construing section 766.316, the Fifth District has explained further:
 

 [T]he formation of the provider-obstetrical patient relationship is what triggers the obligation to furnish the notice. The determination of when this relationship commences is a question of fact. Once the relationship commences, because the statute is silent on the time period within which notice must be furnished, under well-established principles of statutory construction, the law implies that the notice must be given within a reasonable time. This determination depends upon the circumstances, but a central consideration should be whether the patient received the notice in sufficient time to make a meaningful choice of whether to select another provider prior to delivery, which is a primary purpose of the notice requirement.
 

 Weeks,
 
 977 So.2d at 618-19 (citations omitted). Thus the establishment of the patient-provider relationship well before delivery triggers the obligation to furnish the patient with notice within a reasonable time.
 
 Id.
 
 at 620. Under these circumstances, the notice requirement is not excused by a subsequent emergency.
 
 Id.
 

 Here, Mrs. Anderson’s appearance at the Hospital for preregistration marked the beginning of the patient-provider relationship between Mrs. Anderson and the Hospital. It was at that point that the Hospital’s obligation to provide notice within a reasonable time was triggered. The notice should have been furnished within a sufficient time to permit Mrs. Anderson to make a meaningful choice about whether to select another provider prior to delivery. The Hospital’s failure to give Mrs. Anderson notice until the day before her delivery was not reasonable under the circumstances. Accordingly, the ALJ properly concluded that the Hospital failed to comply with the notice provisions of the Plan.
 

 V. CONCLUSION
 

 With respect to the issue of whether Nurse Hilderbrandt had a prearranged plan of treatment, the ALJ erroneously interpreted the Plan. A correct interpretation of the Plan compels a finding that Nurse Hilderbrandt was a participating physician under the Plan. However, the ALJ correctly concluded that the Hospital failed to comply with the notice provisions of the Plan. Accordingly, we affirm in part the ALJ’s final order, reverse in part, and remand with instructions that the ALJ modify the final order consistent with this opinion.
 

 Affirmed in part, reversed in part, and remanded.
 

 VILLANTI and LaROSE, JJ„ Concur.
 

 [1]
 

 . The Hospital owns West Coast OB/GYN.
 

 [2]
 

 . The ALJ determined that he did not have jurisdiction to resolve the issue of immunity from tort liability under subsection 766.303(2), Florida Statutes (2004).
 

 [3]
 

 . At the time of the hearing, Nurse Hilderbrandt was no longer employed at West Coast OB/GYN.
 

 [4]
 

 . Although the issue of Nurse Hilderbrandt's immunity was raised on appeal, we decline to address it because the ALJ correctly ruled that he did not have jurisdiction to rule on that issue.
 
 See All Children's Hosp., Inc. v. Dep’t of Admin. Hearings,
 
 863 So.2d 450, 455 (Fla. 2d DCA 2004) ("There is no basis ... for the ALJ’s foray into the issue of immunity from tort liability under [the Plan]."),
 
 quashed on other grounds by Fla. Birth-Related Neurological Injury Comp. Ass'n v. Fla. Div. of Admin. Hearings,
 
 948 So.2d 705, 716-17 (Fla.2007) (finding that ALJ had jurisdiction to determine whether a health care provider complied with the notice provisions of the Plan);
 
 Depart v. Macri,
 
 902 So.2d 271 (Fla. 1st DCA 2005) (holding that ALJ did not have jurisdiction to address whether a certified nurse midwife was entitled to immunity under the Plan).
 

 [5]
 

 . Nurse Hilderbrandt's physician assessment under the Plan was paid for the calendar years 2003 and 2004.
 

 [6]
 

 . "Prearrange” is defined as "[t]o arrange in advance.”
 
 The American Heritage Dictionary of the English Language
 
 1380 (4th ed. 2000).
 

 [7]
 

 . "Plan” is defined as “[a] scheme, program, or method worked out beforehand for the accomplishment of an objective ... [;][a] proposed or tentative project or course of action ... [,'][a] systematic arrangement of elements or important parts; a configuration or outline.”
 
 The American Heritage Dictionary of the English Language
 
 1341 (4th ed. 2000).
 

 [8]
 

 ."Treatment” is defined as "[ajdministration or application of remedies to a patient or for a disease or injury; medicinal or surgical management; therapy.”
 
 The American Heritage Dictionary of the English Language
 
 1838 (4th ed. 2000).
 

 [9]
 

 . The version of rule 64B9-4.010 in effect when the protocols were filed required that the protocols include:
 

 1. A description of the duties of the [nurse],
 

 2. A description of the duties of the physician or dentist (which shall include consultant and supervisory arrangements in case the physician or dentist is unavailable).
 

 3. The management areas for which the [nurse] is responsible, including
 

 a. The conditions for which therapies may be initiated,
 

 b. The treatments that may be initiated by the [nurse], depending on patient condition and judgment of the [nurse],
 

 c.The drag therapies that the [nurse] may prescribe, initiate, monitor, alter, or order.
 

 4. A provision for annual review by the parties.
 

 5. Specific conditions and a procedure for identifying conditions that require direct evaluation or specific consultation by the physician or dentist. The parties to the protocol, to insure an acceptable standard of supervision and medical care, will decide the detail and scope needed in the description of conditions and treatments, and in doing so will consider the factors listed in paragraphs (l)(a) through (e) above.
 

 Fla. Admin. Code R. 64B9-4.010(2)(b) (effective 1988 until amended 2007).