VAN NORTWICK, J.
In these consolidated appeals, St. Vincent’s Medical Center, Inc., William H. Long, M.D., and North Florida Obstetrics and Gynecology, P.A., challenge a final order of the Division of Administrative Hearings (DOAH) in which the administrative law judge (ALJ) held that the child of Robert and Tammy Bennett, appellees, did not qualify for coverage by the Florida Birth-Related Neurological Injury Compensation Association (NICA). Because the ALJ erred as a matter of law in failing to apply the rebuttable presumption provided by section 766.309(l)(a), Florida Statutes (2001), we reverse and remand for further proceedings.

Factual and Procedural History

Tristan Bennett was born on September 26, 2001, at St. Vincent’s Hospital in Jacksonville. Her birth was preceded by an automobile accident that morning involving the infant’s mother. Following the accident, the mother was transported to a nearby hospital, Ed Fraser Memorial Hospital in MacClenny, Florida, where fetal testing was performed. The decision was made to transport the mother to St. Vincent’s via helicopter. That same day, after declining into kidney failure, the mother underwent a caesarean section. The condition of the infant at the time of her *67 delivery was a matter of controversy below. Although the infant required manual resuscitation, her Apgar scores at birth and within minutes of birth were in the normal range.[1] It is undisputed, however, that the infant experienced renal distress as well as liver damage. She was placed in the special care nursery.
On October 3, 2001, while still in the special care nursery, the infant experienced pulmonary bleeding and then pulmonary arrest leading to multi-organ failure and seizure activity. She was later diagnosed with a neurological injury, cerebral palsy, although the time the neurological injury was sustained remains a matter of controversy. It was only after the October 3 episode that the infant was examined by a pediatric neurologist.
In 2006, the Bennetts filed suit in circuit court against their obstetrician, William H. Long, M.D., his professional association, St. Vincent’s, and fourteen other defendants. The circuit court proceedings were abated for a determination by DOAH as to whether the infant’s injuries were covered by the Florida Birth-Related Neurological Injury Compensation Plan (hereafter, the NICA Plan), section 766.301, et seq., Florida Statutes (2001). The Bennetts had already filed a petition with DOAH to determine compensation under the Plan. In their petition, the Bennetts described the child’s condition at birth as follows:
By the time of her birth by cesarean section, Tristan Bennett had suffered a hypoxic ischemic event that caused permanent brain damage. Tristan Bennett then suffered further injury to her brain during the first several days of life, well after the immediate post-delivery resus-citative period.
They argued in the petition that Dr. Long and St. Vincent’s could not claim NICA immunity because the Bennetts did not receive adequate notice of the NICA Plan. The trial court granted the motion for abatement.
At the administrative hearing, extensive medical records were introduced into evidence, although only two witnesses gave live testimony: the mother, Tammy Bennett, and Gary Hankins, M.D., a board certified obstetrician, who the record reflects has expertise in neonatal encephalopathy and cerebral palsy and whose practice specializes in high risk pregnancies. It was the appellants’ position, generally, that, after the accident but prior to and during the time of delivery, the infant suffered oxygen deprivation as a result of damage to the mother’s placenta and that the pH level, sodium level and blood gases of the infant just prior to and at the time of delivery supported the existence of such a condition. Appellants also asserted that the infant suffered multi-organ damage, as a result of the oxygen deprivation, which in turn caused the acute pulmonary arrest suffered several days later. Further, appellants argued that neurological injury occurred before or at delivery.
Below, appellants requested the ALJ to apply the presumption of compensability provided by section 766.309(l)(a), Florida Statutes. The ALJ refused to apply the presumption, ruling that the presumption is to be applied only for the benefit of claimants and is not available to other parties, such as the appellants.
*68 Following the hearing, the ALJ entered a final order which concluded in pertinent part:
41. The medical records, as well as the testimony of the physicians and other witnesses, have been thoroughly reviewed. Having done so, it must be resolved that the record developed in this case compels the conclusion that, more likely than not, Tristan suffered multi-system failure as a consequence of the oxygen deprivation she suffered between 12:47 p.m. (when the fetal monitor was disconnected and Mrs. Bennett was moved to the operating room) and 1:22 p.m. (when Tristan was delivered), that likely continued during the immediate postdelivery re-suscitative period. However, it is unlikely Tristan suffered a brain injury or substantial neurologic impairment until after she experienced profound episodes of oxygen deprivation on October 3, 2001, following the onset of pulmonary hemorrhaging and pulmonary arrest.
42. In so concluding, it is noted that Tristan was delivered atraumatically, she responded rapidly to resuscitation immediately after delivery, her neuro-logic examinations during the first seven days of life were normal, she suffered prolonged and severe decreases in fetal heart rate and saturations on October 3, 2001, she manifested prolonged and severe acidosis following her arrest, and she evidenced seizure activity and neu-rologic decline thereafter. Given the proof, it is likely, more so than not, that Tristan’s profound neurologic impairments resulted from a brain injury caused by oxygen deprivation that occurred October 3, 2001, and not during labor, delivery, or resuscitation in the immediate postdelivery period in the hospital. Consequently, Tristan was not shown to have suffered a “birth-related neurological injury” as defined by the Plan, and the claim is not compensable. § 766.302(2), Fla. Stat. See also Nagy v. Florida Birth-Related Neurological Injury Compensation Association, 813 So.2d 155, 160 (Fla. 4th DCA 2002) (“According to the plain meaning of the words written, the oxygen deprivation or mechanical injury must take place during labor and delivery, or immediately afterward.”).
(Bold added). Further, the ALJ found that the Bennetts received adequate notice.

Standard of Review

The standard of review of an ALJ’s interpretation of the NICA statutory scheme is de novo. Nagy v. Fla. Birth-Related Neurological Injury Comp. Ass’n, 813 So.2d 155, 159 (Fla. 4th DCA 2002). The ALJ’s determination with regard to the qualification of the claim for compensa-bility purposes under the statute is conclusive and binding as to all questions of fact. § 766.311(1), Fla. Stat. An ALJ’s final order is reversible on appeal, however, where its findings of fact are not supported by competent, substantial evidence. § 120.68(7) and (10), Fla. Stat.; see Nagy, 813 So.2d at 159; Carreras v. Fla. Birth-Related Neurological Injury Comp. Ass’n, 665 So.2d 1082, 1084 (Fla. 3d DCA 1995).

The Rebuttal Presumption under Section 766.309(l)(a)

The NICA Plan was established by the Legislature to provide no-fault compensation for birth-related neurological injuries to infants. See §§ 766.301-.316, Fla. Stat.; Fla. Birth-Related Neurological Injury Comp. Ass’n v. McKaughan, 668 So.2d 974, 978 (Fla.1996). As explained by Judge Altenbernd, “[t]he purpose of the statutory plan is to limit a participating physician’s exposure to civil liability in cases where the doctor’s professional in *69 volvement could make him or her a defendant in a lawsuit.” Fluet v. Fla. Birth-Related, Neurological Injury Comp. Ass’n, 788 So.2d 1010, 1012 (Fla. 2d DCA 2001). The remedies provided under the NICA Plan preclude all other legal remedies available to an injured infant, the parents, or legal representatives. § 766.303(2), Fla. Stat. While the “benefit paid under the plan is more restricted than the remedies provided by tort law, the plan does not require the claimant to prove malpractice and provides a streamlined administrative hearing to resolve the claim.” Fluet, 788 So.2d at 1011, (citing Fla. Birth-Related Neurological Injury Comp. Ass’n v. McKaughan, 668 So.2d at 977).
Under the NICA Plan, a “birth-related neurological injury” is an injury to the brain or spinal cord of a live infant “caused by oxygen deprivation or mechanical injury occurring in the course of labor, delivery, or resuscitation in the immediate postdelivery period in a hospital,” which renders the infant both “permanently and substantially mentally and physically impaired.” § 766.302(2), Fla. Stat. If the infant’s injury satisfies this statutory definition, the infant qualifies for financial benefits under the NICA Plan. See §§ 766.303, 766.309, and 766.31, Fla. Stat. When considering whether a claimed injury is a “birth-related neurological injury” for the purpose of the plan, an ALJ must consider “all available evidence.” § 766.309(1), Fla. Stat.
The appellants, the various medical providers, argue that, given the presumption created by section 766.309(l)(a), the injury to Tristan is within the scope of the NICA Plan. In response, the Bennetts and NICA argue that the presumption cannot be employed in favor of medical providers, but only in favor of a claimant(s), who by statute can only be a legal representative(s) of the injured infant. § 766.302(3), Fla. Stat.
The stipulation entered into by the parties below stated that “Tristan Bennett suffered oxygen deprivation/asphyxia before she was delivered, but Tammy Bennett was never in labor.” The stipulation further stated that
while Tristan suffered from multi-organ system failure due to that oxygen deprivation/asphyxia, which manifested in renal failure, hepatic injury, respiratory complications, and hematologic complications, [the child’s medical records from St. Vincent’s Medical Center] state Tristan did not have permanent and substantial neurological impairment as defined in section 766.302, Florida Statutes, until suffering from severe hypo-natremia, pulmonary arrest, hours of resuscitation, and profound metabolic acidosis on October 3, 2001.
The Bennetts conceded in the stipulation that currently “Tristan is permanently and substantially mentally and physically impaired,” but they claim that her “current condition occurred outside of labor, delivery and immediate post-delivery resuscitation .... ” Thus, they submit, her injuries fall outside the scope of the Plan.
Section 766.309(l)(a), Florida Statutes, provides:
(1) The administrative law judge shall make the following determinations based upon all available evidence:
(a) Whether the injury claimed is a birth-related neurological injury. If the claimant has demonstrated, to the satisfaction of the administrative judge, that the infant has sustained a brain or spinal cord injury caused by oxygen deprivation or mechanical injury and that the infant was thereby rendered permanently and substantially mentally and physically impaired, a rebuttable presumption shall arise that the injury is a birth- *70 related neurological injury as defined in s. 766.302(2).
As noted, the parties stipulated that Tristan is permanently and substantially mentally and physically impaired. Further, the ALJ found that the injury was a neurological one; that is, it involved the brain or the spinal cord. There was no dispute below concerning whether Tristan has sustained a neurological injury. Given the stipulation and the ALJ’s findings of fact, we hold that the ALJ erred as a matter of law in not applying the presumption of compensability.
Under section 766.309(l)(a), the rebutta-ble presumption does not expressly require a showing that the neurological injury occurred during labor, delivery or in the immediate post-delivery period. Of course, section 766.302(2) defines a [b]irth-related neurological injury as an injury to the brain or spinal cord caused by oxygen deprivation or mechanical injury in the course of labor, delivery, or resuscitation in the immediate postdelivery period in a hospital, which renders the infant both “permanently and substantially mentally and physically impaired.” Importantly, neither section 766.302(2) nor section 766.309(l)(a) requires that neurological damage be manifest during “labor, delivery, or resuscitation in the immediate post-delivery period.” It is “oxygen deprivation or mechanical injury” which must occur during “labor, delivery, or resuscitation in the immediate postdelivery period” under the statutory scheme. The applicable statutes do not preclude coverage if neurological damage becomes manifest at a later date. As noted, the ALJ found that Tristan suffered multi-system failure as a consequence of the oxygen deprivation she suffered between the time when the fetal monitor was disconnected and Mrs. Bennett was moved to the operating room and the time when Tristan was delivered, which likely continued during the immediate post-delivery period. That is, as the ALJ further found, “Tristan’s metabolic acidosis and multi-organ system failure support the conclusion that she suffered a hypoxic ischemic insult [i.e., oxygen deprivation] before, during, and likely immediately following delivery.” Based upon these findings, the section 766.309(l)(a) presumption is triggered.
Further, even if the statutory scheme did require manifestation of neurological damage during labor, delivery, and the postdelivery period, Tristan’s injury is still compensable under the Plan. The “immediate postdelivery period in a hospital” has been construed to include an extended period of days when a baby is delivered with a life-threatening condition and requires close supervision. Orlando Reg’l Healthcare Sys., Inc. v. Fla. Birth-Related Neurological, 997 So.2d 426 (Fla. 5th DCA 2008). Here, the ALJ found that:
[T]he record developed in this case compels the conclusion that, more likely than not, Tristan suffered multi-system failure as a consequence of the oxygen deprivation she suffered between 12:47 p.m. (when the fetal monitor was disconnected and Mrs. Bennett was moved to the operating room) and 1:22 p.m. (when Tristan was delivered), that likely continued during the immediate postdeliv-ery resuscitative period.
Shortly after delivery, Tristan was placed in the special care nursery where she remained through October 3. Under these facts, the time between Tristan’s delivery by caesarean section and the events through October 3 constituted the “immediate postdelivery period in the hospital” for purposes of the NICA Plan.
We are not persuaded that legal representatives of an injured claimant can ignore or waive the presumption under section 766.309(l)(a). Under this section, the *71 presumption arises upon the presentation of evidence demonstrating the required injury. While it is true that claimants bear the initial burden of proof under section 766.309(l)(a) and under the act generally, it is also true that the NICA Plan is intended to reduce malpractice claims brought under traditional tort law. See §§ 766.301, 766.303, Fla. Stat. As the Legislature explained in its statement of findings and intent set forth in section 766.301, physicians practicing obstetrics are the most severely affected by rising costs of medical malpractice insurance, and the costs of a birth-related neurological injury are particularly high. The Legislature found that these circumstances “warrant the establishment of a limited system of compensation irrespective of fault.” Id. Thus, under the NICA statutory scheme it is “the intent of the Legislature to provide compensation, on a no-fault basis, for a limited class of catastrophic injuries that result in unusually high costs for custodial care and rehabilitation.”[2] § 766.301(2), Fla. Stat. As the ALJ recognized, the ultimate goal in construing a statutory provision is to give effect to legislative intent. BellSouth Telecomms., Inc. v. Meeks, 863 So.2d 287 (Fla.2003). Applying the presumption of compensability in this case best serves the Legislature’s intent. On the other hand, dispensing with the presumption at the request of a claimant would undermine that intent.
Accordingly, the order of the Division of Administrative Hearings dismissing the petition is REVERSED, and the cause is REMANDED for further proceedings. We find the remaining issues raised on appeal to be moot in view of our disposition.
WEBSTER, J., concurs, and KAHN, J., dissents with written opinion.

. As explained in Nagy v. Florida Birth-Related Neurological Injury Compensation Ass’n, 813 So.2d 155, 156 n. 1 (Fla. 4th DCA 2002), an Apgar score is a numerical expression of the condition of the newborn at birth and at short intervals thereafter and reflects the sum total points gained on an assessment of the heart rate, respiratory effort, muscle tone, reflex irritability and color.

. Commentators have observed that the establishment of NICA has only been partially successful in reducing malpractice claims involving birth-related injuries and that the tort system in Florida continues "to assume an ongoing role in the compensation of birth-related injuries.” David M. Studdert, Lori A. Fritz, and Troyen A. Brennan, "The Jury Is Still In: Florida’s Birth-Related Neurological Injury Compensation Plan After a Decade,” 25 J. Health Pol. Pol’y & L. 499, 523 (2000). As explained by Studdert, Fritz, and Brennan, "[mjany claimants apparently hope that their injury will not meet the definition of a birth-related neurological injury, thus releasing them from the Plan's jurisdiction to pursue malpractice actions... .No doubt claimants are motivated by the prospect of more lucrative compensation in the tort arena, at least in cases where there is a reasonable basis for a negligence claim.” Id. at 521.