PARIENTE, J.
The issue in these consolidated cases is whether parents of a severely brain-damaged infant are precluded from suing in a court of law for the damages sustained by alleged malpractice and instead are re *833 quired to pursue limited compensation in an administrative forum provided by statute under the Florida Birth-Related Neurological Injury Compensation Plan (the NICA Plan). The narrow question is whether the First District Court of Appeal in St. Vincent’s Medical Center, Inc. v. Bennett, 27 So.3d 65 (Fla. 1st DCA 2009), interpreted the term “immediate postdeliv-ery period in a hospital,” as that term is used in the statutory scheme, too expansively. The parents (the Bennetts) and the Florida Birth-Related Neurological Injury Compensation Association (NICA), which administers the NICA fund, both assert that the First District interpreted that term too broadly so as to preclude the Bennetts from pursuing their common law remedies in court.[1] We have jurisdiction on the basis of express and direct conflict with the Fifth District Court of Appeal’s decision in Orlando Regional Healthcare System, Inc. v. Florida Birth-Related Neurological, 997 So.2d 426 (Fla. 5th DCA 2008). See art. V, § 3(b)(3), Fla. Const. For the reasons that follow, we quash the decision of the First District below.
OVERVIEW
Tristan Bennett, the minor child of Robert and Tammy Bennett, is permanently and substantially brain damaged as a result of alleged medical malpractice on the part of William H. Long, M.D., and St. Vincent’s Medical Center, Inc., as well as other medical providers. In a narrow category of cases in which a “birth-related neurological injury” occurs, parents’ common law rights to sue on behalf of their children for medical malpractice are eliminated and replaced by an administrative remedy that provides limited compensation on a no-fault basis. “Birth-related neurological injury” is defined by statute as “injury to the brain ... caused cy oxygen deprivation ... occurring in the course of labor, delivery, or resuscitation in the immediate postdelivery period in a hospital, which renders the infant permanently and substantially mentally and physically impaired.” § 766.302(2), Fla. St it. (2001). The question presented is whetner, under the factual circumstances of this case, Tristan Bennett suffered a “birth-related neurological injury,” which would require the Bennetts to obtain limited compensation through the NICA Plan instead of full damages in a court of law. Tha t question can be answered only by interpreting the governing statutory provisions.
The First District held that the Ben-netts were limited to the administrative remedy provided by the NICA Plan, reversing the decision of the adm: listrative law judge (ALJ), who found tha; Tristan did not suffer a “birth-related necrological injury” as defined by the NICA Plan. See Bennett, 27 So.3d at 66. We con : ude that the First District’s statutory con struction analysis of the applicable statute was flawed in two separate ways.
First, the district court interpreted the phrase “immediate postdelivery period in the hospital” to mean “an extended period of days when a baby is delivered with a life-threatening condition and requires close supervision.” Id. at 70. Because the First District failed to read the phrase “immediate postdelivery period” as modifying “resuscitation,” the First District expanded the NICA Plan to cover infants beyond the limit contemplated by the express language of the statute. Second, the First District incorrectly held that under section 766.309(l)(a), Florida Statutes (2001), the rebuttable presumption of coverage under the NICA Plan applied to *834 benefit the defendants, even though the Bennetts were not making a claim for compensation under the NICA Plan. Accordingly, in reviewing the facts under the correct interpretation of the statute, we hold that the ALJ’s finding that Tristan did not sustain a “birth-related neurological injury” under the NICA Plan is supported by competent, substantial evidence.
FACTS AND PROCEDURAL HISTORY
Tristan Bennett was born on September 26, 2001, at St. Vincent’s Hospital in Jacksonville. The morning of her birth, her mother Tammy Bennett was involved in an automobile accident. Following the accident, the mother was transported to a nearby hospital in MacClenny, Florida, where fetal testing was performed. As a result of that testing, the decision was made to transport the mother by helicopter to St. Vincent’s Hospital. That same day, the mother declined into kidney failure and underwent a caesarean section performed by Dr. Long, her obstetrician.
The operation began at 1:16 p.m. and the baby, Tristan, was delivered at 1:22 p.m. Evidence of a partial placental abruption was noted. According to the hospital records, after delivery, Tristan did not cry, had minimal respiratory effort, and required resuscitation “with bulb, free flow oxygen, mechanical suction, and bag and mask ambu.” Tristan had an Apgar score[2] of 6 at one minute and a score of 8 at five minutes, which was considered normal. Cord blood gas revealed profound metabolic acidosis. Tristan was initially transferred to the newborn nursery at 1:45 p.m., but then at 2:10 p.m., she was transferred to the special care nursery due to moderate respiratory distress and metabolic acidosis. Her respiratory distress and metabolic acidosis resolved fairly quickly, and by 9:30 p.m. her respiration was noted as unlabored. Tristan remained in the special care nursery.
After Tristan’s initial problems were resolved, she suffered from numerous conditions in the week following her birth, many of which were linked to kidney and liver damage. However, there is no indication of any ongoing treatment for respiratory distress and no other resuscitative efforts. The physician progress notes during this time did not document any neurological damage, but instead noted that “neuro” was “grossly intact.” No neurological abnormalities were noted, and no request for a consultation by a pediatric neurologist was made.
On October 3, 2001, seven days after her birth, Tristan suffered from a pulmonary hemorrhage, was not breathing at times, and had a large amount of frank blood coming from her mouth. Her heart rate was extremely low, and her oxygen satu-rations were very low. She remained in very unstable condition most of the day. By the end of the day, Tristan showed signs of possible neurologic abnormalities, including the likely onset of seizure activity. On October 4, after more possible seizures and central nervous system tremors were noted, an electroencephalogram (EEG) and computerized tomography scan (CT) were ordered. A pediatric neurologist was consulted on October 5. Testing conducted later showed likely neurological damage, including “multicystic encelphalo-malacia of the cortex.” Tristan’s EEGs were also abnormal, suggesting diffuse ce *835 rebral dysfunction. Tristan suffered permanent and substantial neurological damage.
The Bennetts filed suit in circuit court against their obstetrician, William H. Long, his professional association, St. Vin cent’s Hospital, and numerous other defendants. The trial court abated the circuit court proceedings for a determination by the Division of Administrative Hearings as to whether the infant’s injuries qualified for coverage under the NICA Plan. In the petition for determination of NICA coverage, the Bennetts alleged that long after the postdelivery period had ended, Tristan’s medical providers committed numerous errors, including administering too much IV fluid and failing to test for serum electrolyte derangements until numerous days after the delivery. As required by statute, NICA was served with the petition in the administrative proceedings. NICA intervened and took the position that Tristan did not suffer a “birth-related neurological injury” within the scope of section 766.302(2).
In the administrative hearing, the critical issue was whether the brain injury caused by oxygen deprivation that resulted in Tristan’s permanent and substantial mental impairment occurred on September 26, 2001, the day she was born, or during a second and separate incident of oxygen deprivation that occurred on October 3, 2001. That determination of timing was critical to whether there was coverage under the statute. After presentation of evidence by both sides, the ALJ entered a detailed written order finding that Tristan’s injuries were not within the scope of the NICA Plan because, more likely than not, Tristan’s profound neurological impairment resulted from a brain injury caused by the second incident of oxygen deprivation on October 3, 2001, and was not caused during labor, delivery, or resuscitation in the immediate postdelivery period. In support of this conclusion, the ALJ made the following findings in the final order:
41. The medical records, as well as the testimony of the physicians and other witnesses, have been thoroughly reviewed. Having done so, it must be resolved that the record developed in this case compels the conclusion that, more likely than not, Tristan suffered multi-system failure as a consequence of the oxygen deprivation she suffered between 12:47 p.m. (when the fetal monitor was disconnected and Mrs. Bennett was moved to the operating room) and 1:22 p.m. (when Tristan was delivered), that likely continued during the immediate postdelivery resuscitative period. However, it is unlikely Tristan suffered, a brain injury or substantial neurologic impairment until after she experienced profound episodes of oxygen deprivation on October 3, 2001, following the onset of pulmonary hemorrhaging and pulmonary arrest.
42. In so concluding, it is noted that Tristan was delivered atraumatically, she responded rapidly to resuscitation immediately after delivery, her neuro-logic examinations during the first seven days of life were normal, she suffered prolonged and severe decreases in fetal heart rate and saturations on October 3, 2001, she manifested prolonged and severe acidosis following her arrest, and she evidenced seizure activity and neu-rologic decline thereafter. Given the proof, it is likely, more so than not, that Tristan’s profound neurologic impairments resulted from a brain injury caused by oxygen deprivation that occurred October 3, 2001, and not during labor, delivery, or resuscitation in the immediate postdelivery period in the hospital. Consequently, Tristan was not shown to have suffered a “birth-related neurological injury” as defined by the *836 Plan, and the claim is not compensable. § 766.302(2), Fla. Stat. See also Nagy v. Florida Birth-Related Neurological Injury Compensation Association, 813 So.2d 155, 160 (Fla. 4th DCA 2002) (“According to the plain meaning of the words written, the oxygen deprivation or mechanical injury must take place during labor and delivery, or immediately afterward.”).
Bennett v. Fla. Birth-Related Neuro. Injury Comp. Ass’n, 29 F.A.L.R. 3867, 3879-80 (Fla. Div. of Admin. Hrgs. Oct. 3, 2007) (emphasis added).
The First District reversed the ALJ, holding that the ALJ should have applied the statutory presumption of compensability set forth in section 766.309(1)(a). Bennett, 27 So.3d at 70-71. Further, the First District held that the “neurological damage” did not have to be manifest during the labor, delivery, or resuscitation in the postdelivery period, but even if the statute required manifestation of neurological damage in that period, Tristan’s injuries would still be compensable under the NICA Plan. Id. at 70. The First District then held that the phrase “immediate post-delivery period in a hospital” has been construed to “include an extended period of days when a baby is delivered with a life-threatening condition and requires close supervision,” citing to the Fifth District’s decision in Orlando Regional. Bennett, 27 So.3d at 70. After quoting the ALJ’s findings that Tristan suffered from oxygen deprivation at the time of her birth and was placed in a special care nursery where she remained for a week after her birth, the court concluded that “the time between Tristan’s delivery by caesarean section and the events through October 3 constituted the ‘immediate postdelivery period in the hospital’ for purposes of the NICA Plan.” Id,. The Bennetts and NICA both sought this Court’s discretionary review, which we granted.
ANALYSIS

I. Background of the NICA Plan

In 1988, the Florida Legislature created the NICA Plan as a means to alleviate the high costs of medical malpractice insurance for physicians practicing obstetrics. The Legislature found that obstetricians were among the most severely affected by the increasing malpractice insurance premiums and that the costs of birth-related neurological injury claims were particularly high. § 766.301(1), Fla. Stat. (2001). Consequently, the Legislature created the NICA fund to “provide compensation, on a no-fault basis, for a limited class” of birth-related neurological injuries. § 766.301(2), Fla. Stat. (2001). Because the NICA Plan provides limited remedies as a statutory substitute for common law rights and liabilities,[3] this Court has held that the NICA statute “should be strictly construed to include only those subjects clearly embraced within its terms.” Fla. Birih-Related Neuro. Injury Comp. Ass’n v. Fla. Div. of Admin. Hearings, 686 So.2d 1349, 1354 (Fla.1997) (quoting Humana of Fla., Inc. v. McKaughan, 652 So.2d 852, 859 (Fla. 2d DCA 1995)).
The NICA Plan does not cover all incidents of brain damage sustained by an infant delivered by an obstetrician. No party in this case contends that the statute provides immunity from suit to physicians practicing obstetrics for alleged malpractice occurring during labor and delivery; rather, the immunity is narrowly circumscribed by the term “birth-related neurological injury.” Specifically, the Legislature has limited coverage under the NICA *837 Plan to a “[b]irth-related neurological injury,” which it defined as
injury to the brain or spinal cord of a live infant weighing at least 2,500 grams for a single gestation ... caused by oxygen deprivation or mechanical injury occurring in the course of labor, delivery, or resuscitation in the immediate postdelivery period in a hospital, which renders the infant permanently and substantially mentally and physically impaired. This definition shall apply to live births only and shall not include disability or death caused by genetic or congenital abnormality.
§ 766.302(2), Fla. Stat. (2001). Thus, based on the language of the statute, a birth-related neurological injury has four components: (1) an injury to the brain or spinal cord; (2) which is caused by oxygen deprivation or mechanical injury; (3) during labor, delivery, or resuscitation in the immediate postdelivery period; and (4) which renders the infant permanently and substantially impaired.
The ALJ has exclusive jurisdiction to determine whether a claim is compensa-ble under the NICA Plan. See § 766.301(l)(d), Fla. Stat. (2001) (“The issue of whether such claims are covered by this act must be determined exclusively in an administrative proceeding.”). In making this determination, the ALJ is required to make the following determinations: (1) whether the injury claimed is a birth-related neurological injury; (2) whether obstetrical services were delivered by a participating physician in the course of labor, delivery, or resuscitation in the immediate postdelivery period in a hospital; and (3) the amount of compensation that is award-able. See § 766.309(1), Fla. Stat. (2001). In determining whether the injury is a birth-related neurological injury, section 766.309(l)(a) provides for a rebuttable presumption as follows:
If the claimant has demonstrated, to the satisfaction of the administrative law judge, that the infant has sustained a brain or spinal cord injury caused by oxygen deprivation or mechanical injury and that the infant was thereby rendered permanently and substantially mentally and physically impaired, a re-buttable presumption shall arise that the injury is a birth-related neurological injury as defined in s. 766.302(2).
§ 766.309(l)(a), Fla. Stat. (2001). Through this presumption, the claimant does not need to demonstrate that the injury occurred during labor, delivery, or resuscitation in the immediate postdelivery period.
Under the NICA statute, NICA is the administrator of the NICA Plan and has statutory responsibilities, including the responsibility to administer the funds collected on behalf of the Plan, administer the payment of claims on behalf of the Plan, exercise all powers necessary to effect any of the purposes for which the Plan was created, and take legal action as necessary to avoid the payment of improper claims, among other duties. See generally § 766.315(4), Fla. Stat. (2001).

II. Statutory Interpretation of the Phrase “Resuscitation in the Immediate Postdelivery Period”

Because the issue involves whether the First District properly interpreted the NICA statute, this Court’s standard of review is de novo. See Fla. Birth-Related Neuro. Injury Comp. Ass’n v. Dep’t of Admin. Hearings, 29 So.3d 992, 997 (Fla.2010); Fla. Birth-Related Neuro. Injury Comp. Ass’n v. Fla. Div. of Admin. Hearings, 948 So.2d 705, 709-10 (Fla.2007). The Court must begin with the actual language in the statute “because legislative intent is determined primarily from the statute’s text.” Heart of Adoptions, Inc. v. J.A., 963 So.2d 189, 198 (Fla.2007). As this Court has often repeated, *838 “When the language of the statute is clear and unambiguous and conveys a clear and definite meaning, there is no occasion for resorting to the rules of statutory interpretation and construction; the statute must be given its plain and obvious meaning.” Fla. Birth-Related Neuro. Injury Comp. Ass’n, 29 So.3d at 997 (quoting Holly v. Auld, 450 So.2d 217, 219 (Fla.1984)). Further, courts are “without power to construe an unambiguous statute in a way which would extend, modify, or limit, its express terms or its reasonable and obvious implications. To do so would be an abrogation of legislative power.” McLaughlin v. State, 721 So.2d 1170, 1172 (Fla.1998) (quoting Holly, 450 So.2d at 219). Likewise, when a court interprets a statute, “it must give full effect to all statutory provisions. Courts should avoid readings that would render part of a statute meaningless.” Gomez v. Vill. of Pinecrest, 41 So.3d 180, 185 (Fla.2010) (quoting Velez v. Miami-Dade Cnty. Police Dep’t, 934 So.2d 1162, 1165 (Fla.2006)). Another important principle that applies in this case is that because the NICA Plan limits the remedies as a statutory substitute for common law rights and liabilities, its provisions should be strictly construed. Fla. Birth-Related Neuro. Injury Comp. Ass’n, 686 So.2d at 1354 (quoting McKaughan, 652 So.2d at 859).
In turning to the statutory language, section 766.302(2) defines “[b]irth-related neurological injury” to mean:
[Ijnjury to the brain or spinal cord of a live infant ... caused by oxygen deprivation or mechanical injury occurring in the course of labor, delivery, or resuscitation in the immediate postdelivery period in a hospital, which renders the infant permanently and substantially mentally and physically impaired.
§ 766.302(2), Fla. Stat. (2001) (emphasis added). In applying the statute to this case, there is no factual dispute that Tristan suffered from two incidents of oxygen deprivation: one on September 26, 2001, and the other on October 3, 2001. Nor is there any question that she suffered a brain injury that rendered her permanently and substantially mentally and physically impaired. The only question becomes whether Tristan’s brain injury occurred “in the course of labor, delivery, or resuscitation in the immediate postdelivery period in a hospital.”
Here, the ALJ made factual findings that Tristan did not suffer a “birth-related neurological injury” as defined by the NICA Plan because “Tristan’s profound neurologic impairments resulted from a brain injury caused by oxygen deprivation that occurred [on] October 3, 2001, and not during labor, delivery, or resuscitation in the immediate postdelivery period in the hospital.” 29 F.A.L.R. at 3880. In making this determination, the ALJ found that although the record established that Tristan, more likely than not, suffered from oxygen deprivation at birth on September 26, resulting in a multi-system failure that included her liver and kidneys, this oxygen deprivation did not cause a substantial neurological impairment. In support of this finding, the ALJ noted that the record established that she was delivered atrau-matically, responded well to initial resuscitation, and her neurological examinations during the first seven days of life were normal. However, on October 3, she suffered prolonged and severe acidosis and shortly thereafter evidenced seizure activity and neurological decline.
The First District reversed, holding instead that both incidents of oxygen deprivation were within the term “immediate postdelivery period in a hospital.” Bennett, 27 So.3d at 70. To reach this conclusion, the First District interpreted the term “immediate postdelivery period in a hospital” to include “an extended period of *839 days when a baby is delivered with a life-threatening condition and requires close supervision.” Id. In support, the First District relied on language from the Fifth District’s decision in Orlando Regional. Bennett, 27 So.Bd at 70. Thus, it is instructive to review the decision in Orlando Regional and how it interpreted the same statutory provision.
In Orlando Regional, the Fifth District was faced with a factual scenario that was different from Bennett in a significant respect regarding ongoing efforts at resuscitation. The infant in the Orlando Regional case was delivered by cesarean section after the infant’s heart rate rose too rapidly. Orlando Reg’l Healthcare Sys., Inc., 997 So.2d at 428. Upon delivery, the infant was unable to breathe spontaneously, and medical providers provided resuscitation. He was moved to a special care nursery where resuscitation efforts continued, and later, he was transferred again to a neonatal intensive care unit for continued aggressive resuscitation. Id. His status continued to decline, even though he was placed on high frequency oscillatory ventilation and later a heart/lung bypass machine. Id. at 429. He remained on this machine for the next six days, but later suffered from an intracranial hemorrhage and died. After reviewing the statutory terms and the medical depositions, the ALJ held that the claim was not subject to compensation under the NICA Plan. Id. at 481-32.
The Fifth District noted that while the statute does not define the phrase “resuscitation in the immediate postdelivery period,” all of the experts agreed that the period would last “until the infant was stabilized.” Id. at 431. However, the experts disagreed as to when the infant was stabilized. The Fifth District undertook an appropriate statutory construction analysis of the terms “resuscitation” and “immediate,” neither of which is defined by the statute:
Under the Plan, the terms “resuscitation” and “immediate” are important qualifiers to determining the compensa-bility of a claim. However, those terms are not defined by the statute. When a term is not defined within a statute, a fundamental construction tool requires giving a statutory term its “plain and ordinary meaning.” Green v. State, 604 So.2d 471, 473 (Fla.1992); Dianderas v. Fla. Birth Related Neurological, 973 So.2d 523, 527 (Fla. 5th DCA 2007). When necessary, the plain and ordinary meaning can be ascertained by reference to a dictionary. Green, 604 So.2d at 473; see also L.B. v. State, 700 So.2d 370, 372 (Fla.1997) (explaining that “court may refer to a dictionary to ascertain the plain and ordinary meaning”). This Court has previously utilized references to dictionaries and medical references to interpret other provisions of the statute. See, e.g., Dianderas, 973 So.2d at 527.
The American Heritage Dictionary defines the term “resuscitate” as “[t]o return to consciousness, vigor or life; revive.” The American Heritage Dictionary 1054 (2d ed. 1985). Dorland’s Illustrated Medical Dictionary similarly defines “resuscitation” as “the restoration to life or consciousness of one apparently dead; it includes such measures as artificial respiration and cardiac massage.” Dorland’s Illustrated Medical Dictionary 1145 (26th ed. 1981). Further, “immediate” is commonly understood to mean “[n]ext in line or relation^] ... [ojccuring without delay[;] [o]f or near the present time[;] ... [c]lose at hand; near.” The American Heritage Dictionary 643 (2d ed. 1985); see Merriam-Webster’s Collegiate Dictionary 578 (10th ed. 2000) (defining “immediate” as “being next in line or relational ... existing without intervening *840 space or substance[;] ... being near at hand[;] ... occurring, acting, or accomplished without loss or interval of time[;] ... near or related to the present”).
Orlando Reg’l Healthcare Sys., Inc., 997 So.2d at 431-32. In reversing the ALJ’s interpretation of the phrase “resuscitation in the immediate postdelivery period,” the Fifth District explained:
The ALJ reviewed both the plain meaning of “resuscitate” and “immediate,” but limited the “resuscitation in the immediate postdelivery period” to only the first resuscitation necessarily performed on Harper as a result of the code called. However, in looking at the definition of “resuscitate,” it includes measures such as artificial respiration. In this case, although the code ended at 1:05 p.m., Harper continued to suffer respiratory failure that required artificial respiration. He could not breathe on his own and required active resuscitation continuously until he was placed on the [heart/lung] bypass. It is not logical to find that “immediate’’ only means through the first resuscitative attempt when Harper was initially revived, but no spontaneous respirations could othe'rwise be established. Harper continued to need resuscitation, without interruption, and that ongoing need creates one time period — the “immediate postdelivery period.”
Id. at 432 (emphasis added).
In reviewing the critical facts in the Fifth District’s decision, the infant clearly required resuscitation by ongoing active and continuous artificial respiration until he was finally placed on a heart/lung bypass machine — a fact that was crucial to the Fifth District’s holding. In other words, it was the ongoing need for resuscitation that created the onetime period. Id. Because the undisputed facts in Orlando Regional showed that the infant’s brain injury occurred as a result of oxygen deprivation between the time of birth and being placed on the heart/lung bypass machine, the court held that the injury qualified under the NICA Plan. Id.
Although the First District relied on language from Orlando Regional, the opinion in Bennett actually conflicts with Orlando Regional because in Bennett, the First District defines the phrase “resuscitation in the immediate postdelivery period” much more expansively, holding that “close supervision” during the week-long period after birth is sufficient to qualify under the NICA Plan. Bennett, 27 So.3d at 70. It is important to note the significant difference between the facts of this case and those in Orlando Regional regarding resuscitation. In Bennett, while the medical providers provided initial resuscitation to Tristan shortly after birth, she responded well to the treatment, was stabilized, and was initially sent to the regular newborn nursery. Bennett, 27 So.3d at 68. Although Tristan was eventually sent to the special care nursery, the records do not reveal ongoing problems related to respiration in her first few days after birth and do not show any ongoing efforts related to any form of resuscitation that continued during the week after her birth.
Despite the absence of such circumstances, the First District apparently relied on the fact that Tristan was placed in a special care nursery in order to hold that the second incident of oxygen deprivation was within the statutory period. Specifically, the First District stated, “Shortly after delivery, Tristan was placed in the special care nursery where she remained through October 3. Under these facts, the time between Tristan’s delivery by caesarean section and the events through October 3 constituted the ‘immediate postdeliv-ery period in the hospital’ for purposes of the NICA Plan.” Id. at 70. However, requiring close supervision because of medi *841 cal problems, even a life-threatening condition occurring as a result of birth, is not the statutory prerequisite for compensation, which requires a showing that Tristan’s brain injury was caused by oxygen deprivation “in the course of labor, delivery, or resuscitation in the immediate postdelivery period in the hospital.” In contrast, in Orlando Regional, there was ongoing active and continuous artificial respiration.
The First District in this case erroneously treats the statutory term “in the immediate postdelivery period in the hospital” as a separate time period without regard to the word “resuscitation” preceding it. The First District violates the tenets of statutory interpretation by reading out the word “resuscitation” and focusing on the phrase “in the immediate postdeliv-ery period.” See Gomez, 41 So.3d at 185 (“Courts should avoid readings that would render part of a statute meaningless.” (quoting Velez, 934 So.2d at 1165)). However, under the plain language of the statute, the phrase “in the immediate postde-livery period” is a modifier and not an independent phrase. Section 766.302(2) narrows a birth-related neurological injury to one occurring in the course of “labor, delivery, or resuscitation in the immediate postdelivery period.” The only word that “immediate postdelivery period” can modify is the term “resuscitation” because both labor and delivery are clearly not within the immediate post delivery period. Thus, in its interpretation of the time period when the brain injury must occur, the First District alters the plain meaning of the statute, which provides that the injury must by caused by oxygen deprivation or mechanical injury that occurred during labor, delivery, or resuscitation in the immediate postdelivery period and goes against the mandate that this statute be strictly construed to include only those subjects clearly embraced within its terms. See Fla. Birth-Related Neuro. Injury Comp. Ass’n, 29 So.3d at 997 (“[T]he statute must be given its plain and obvious meaning.”); Fla. Birth-Related Neuro. Injury Comp. Ass’n, 686 So.2d at 1354.
Furthermore, to the extent that the First District relied on the ALJ’s finding of fact that at the time of birth there was an incident of oxygen deprivation resulting in a multi-system failure, the First District reads out the requirement that the permanent and substantial neurological impairment must result from a brain injury caused by oxygen deprivation occurring during labor, delivery or resuscitation in the postdelivery period. See Gomez, 41 So.3d at 185 (stating that courts should avoid readings that would render part of a statute meaningless). Specifically, the ALJ found that although there was a mul-ti-system failure as a result of oxygen deprivation near the time of delivery, it was more likely than not that “Tristan’s profound neurologic impairments resulted from a brain injury caused by oxygen deprivation that occurred [on] October 3, 2001.” The First District did not directly address these explicit findings, but rejected the ALJ’s conclusions, stating that the definition of “birth-related neurological injury” does not require that “neurological damage be manifest during ‘labor, delivery, or resuscitation in the immediate post-delivery period’ ” under the statutory scheme. Bennett, 27 So.3d at 70 (emphasis added). It appears, however, that the First District erroneously injected the term “manifest” into the statutory definition when no such term occurs. See Hayes v. State, 750 So.2d 1, 4 (Fla.1999) (“We are not at liberty to add words to statutes that were not placed there by the Legislature.”).
In reviewing the definition provided by section 766.302(2), the phrases “caused by” and “occurring in” set forth in the phrase “injury to the brain ... caused *842 by oxygen deprivation ... occurring in the course of labor, delivery, or resuscitation in the immediate postdelivery period” are essential phrases that modify “the injury to the brain” and not each other. In other words, the injury to the brain must be caused by oxygen deprivation and that injury must occur “in the course of labor, delivery, or resuscitation in the immediate postdelivery period.” The First District may be correct that the actual evidence of the severe impairment need not be “manifest” at the time of “labor, delivery or resuscitation in the immediate postdelivery period,” but that is not the issue in this case where the ALJ made factual findings that the injury actually occurred on October 3.
We hold that a narrow construction of the statute is the more reasonable interpretation. First, it restricts the impact of the statute to those situations involving obstetricians, who are the group of physicians that the NICA Plan was designed to benefit. Otherwise, as NICA points out in its brief, under the First District’s interpretation, the statute would be expanded to cover situations where an infant is “transferred from the delivery room” and the “obstetrician relinquishes responsibility of the infant to other health care providers.”
A strict interpretation of the statutory definition is also necessary based on the overriding statutory construction principle that has been applied to this statute that because the NICA Plan eliminates common law rights, its provisions should be strictly construed. Fla. Birth-Related Neuro. Injury Comp. Ass’n, 686 So.2d at 1354. For all these reasons, we disapprove of the First District’s statutory interpretation holding that the injury in question occurred in the course of “resuscitation in the immediate postdelivery period” where the facts, as found by the ALJ, do not demonstrate that there was a continuous, ongoing need of resuscitation from the time of birth to the time of the injury that resulted in the severe impairment.

III. Rebuttable Presumption of Compensability

We next review whether the First District was correct in its analysis that the statutory presumption in favor of com-pensability applied, even though the Ben-netts did not seek to invoke this presumption.[4] In the administrative hearing before the ALJ, the respondents (the defendants in the medical malpractice case) requested that the ALJ apply a statutory presumption of compensability under the NICA Plan. The ALJ rejected this request, ruling that the statutory presumption is available only for the claimants’ benefit and is not available to “aid other parties in satisfying their burden to establish that Tristan’s brain injury occurred in the course of labor, delivery, or resuscitation.” In the alternative, the ALJ held that “credible evidence [was] produced (in Tristan’s medical records) to support a contrary conclusion, and to require resolution of the issue without regard to the presumption.” 29 F.A.L.R. at 3879.
The First District held that the ALJ’s statutory interpretation was in error because, pursuant to the statute, the presumption was triggered where the claimant demonstrated: (1) the infant sustained a brain injury caused by oxygen deprivation; and (2) the infant was thereby rendered substantially and permanently im *843 paired. Bennett, 27 So.3d at 70. The majority explicitly rejected the contention that the presumption can be invoked only by the claimant:
Under this section, the presumption arises upon the presentation of evidence demonstrating the required injury. While it is true that claimants bear the initial burden of proof under section 766.309(l)(a) and under the act generally, it is also true that the NICA Plan is intended to reduce malpractice claims brought under traditional tort law. See §§ 766.301, 766.303, Fla. Stat. As the Legislature explained in its statement of findings and intent set forth in section 766.301, physicians practicing obstetrics are the most severely affected by rising costs of medical malpractice insurance, and the costs of a birth-related neurological injury are particularly high. The Legislature found that .these circumstances “warrant the establishment of a limited system of compensation irrespective of fault.” Id. Thus, under the NICA statutory scheme it is “the intent of the Legislature to provide compensation, on a no-fault basis, for a limited class of catastrophic injuries that result in unusually high costs for custodial care and rehabilitation.” § 766.301(2), Fla. Stat. As the ALJ recognized, the ultimate goal in construing a statutory provision is to give effect to legislative intent. BellSouth Telecomms., Inc. v. Meeks, 863 So.2d 287 (Fla.2003). Applying the presumption of compensability in this case best serves the Legislature’s intent. On the other hand, dispensing with the presumption at the request of a claimant would undermine that intent.
Id. at 70-71 (footnote omitted).
Judge Kahn dissented as to this issue, reasoning that the language of the statute provided a precondition (“[i]f the claimant has demonstrated”). Id. at 72 (Kahn, J., dissenting). Thus, this precondition would not arise where the Bennetts did not invoke the presumption. Judge Kahn further stated that the purpose of the statutory presumption is to aid a claimant in proving the prerequisite elements to a NICA claim, particularly in light of the fact that the NICA statute deprives claimants of the common law remedy of a tort action. Id. Therefore, it was “reasonable to conclude that the Legislature had this in mind when it provided the presumption which certainly makes it easier for claimants to prove they are entitled to coverage under [the NICA Plan], as opposed to having to shoulder the burden of proof they would encounter in a civil tort proceeding.” Id.
The issue of the application of the presumption is also a matter of statutory interpretation, which the Court reviews de novo. Fla. Birth-Related Neuro. Injury Comp. Ass’n, 29 So.3d at 997. If the statutory language is ambiguous and capable of different meanings, “this Court will apply established principles of statutory construction to resolve the ambiguity.” Barco v. Sch. Bd. of Pinellas Cnty., 975 So.2d 1116, 1122 (Fla.2008).
The specific language of the statutory presumption is found in section 766.309(1), which requires the ALJ to make certain determinations based on “all available evidence.” The first determination is “[w]hether the injury claimed is a birth-related neurological injury.” § 766.309(l)(a), Fla. Stat. (2001). That subsection then includes a rebuttable presumption:
If the claimant has demonstrated, to the satisfaction of the administrative law judge, that the infant has sustained a brain or spinal cord injury caused by oxygen deprivation or mechanical injury and that the infant was thereby rendered permanently and substantially mentally and physically impaired, a re-buttable presumption shall arise that the *844 injury is a birth-related neurological injury as defined in s. 766.302(2).
Id. As can be seen by the express wording of the statutory presumption, the application of the presumption does not depend on when the brain injury occurred. Therefore, if the claimant seeking benefits under the NICA Plan knows only that the infant has sustained a brain injury caused by oxygen deprivation that has rendered the infant permanently and substantially impaired, the claimant does not have to establish that the incident occurred during labor, delivery, or resuscitation in the immediate postdelivery period.
Under this provision, the re-buttable presumption arises in favor of a “claimant” who has demonstrated the statutory prerequisites. The term “claimant” is defined in the statutory scheme and therefore section 766.309 should be read together with the definitional section of the same statutory scheme. See Golf Channel v. Jenkins, 752 So.2d 561, 564 (Fla.2000) (“[Rjelated statutory provisions should be read together to determine legislative intent, so that if from a view of the whole law, or from other laws in pan materia the evident intent is different from the literal import of the terms employed to express it in a particular part of the law, that intent should prevail, for that, in fact is the will of the Legislature.” (internal quotation marks omitted)). Under section 766.302, a “claimant” is defined as “any person who files a claim ... for compensation” under the NICA statute for a “birth-related neurological injury.” § 766.302(3), Fla. Stat. (2001). A claimant for the purpose of the statutory presumption is thus defined with reference to whether the person is seeking compensation under the NICA Plan. Accordingly, we hold that where an individual is not seeking compensation under the NICA Plan, but is instead seeking to establish the right to sue in a court of law, that individual is not a claimant for the purposes of the statutory presumption.
In this case, the Bennetts were not seeking compensation under the NICA Plan; in fact, they were seeking a determination that they were not covered by the statute. It was the respondent doctor and hospital who sought a determination that the Bennetts were covered by the NICA Plan and, accordingly, that the Bennetts were barred from seeking damages in court through a medical malpractice action. Therefore, the Bennetts were not claimants seeking the benefit of the presumption by claiming compensation, and the respondents were not entitled to the benefit of the presumption.
Although there is no statement of why this rebuttable presumption was created, it is helpful to review the history of legislative changes to this section in determining legislative intent. See, e.g., Seagrave v. State, 802 So.2d 281, 288 (Fla.2001) (although legislative intent must be determined primarily from language of the statute, the history of the prior legislative enactments assists the court in determining legislative intent). In this case, we have the prior legislative enactment of the rebuttable presumption statute. Specifically, when the Legislature first created the NICA Plan, section 766.309(1) provided:
1. A rebuttable presumption shall arise that the injury alleged is a birth-related neurological injury where it has been demonstrated, to the satisfaction of the deputy commissioner, that the infant has sustained a brain or spinal cord injury caused by oxygen deprivation or mechanical injury, and that the infant was thereby rendered permanently and substantially mentally and physically impaired.
2. If either party disagrees with such presumption, that party shall have the *845 burden of proving that the injuries are not birth-related neurological injuries within the meaning of the chapter.
§ 766.309(l)(a), Fla. Stat. (1988 Supp.).
This prior legislative enactment made it clear that the rebuttable presumption arose in favor of either party if certain prerequisites were demonstrated and then specifically shifted the burden of proof to the party disagreeing with the presumption to prove that the injuries were not birth-related neurological injuries. If this specific statutory enactment had been in place, there is no question that the rebut-table presumption would arise, and thus the Bennetts, who disagreed with the presumption, would have the burden of proving that the injury was not a birth-related neurological injury. However, this section was specifically amended the following year to its present form to limit the rebut-table presumption to favor only the claimant. See ch. 89-186, § 4, Laws of Fla.
The revision made two changes. First, it changed the language “where it had been demonstrated” to “if the claimant has demonstrated.” Id. Second, the Legislature deleted the paragraph that shifted the burden to the party disagreeing with the presumption. Id. Since 1989, the language of the rebuttable presumption has remained unchanged.
To interpret the rebuttable presumption language in section 766.309(l)(a) to inure to the benefit of the respondent and shift the burden of proof back to the claimant would essentially return the statute to the pre-1989 language. Rejecting this interpretation is consistent with the explanation provided in Judge Kahn’s dissent:
It seems completely clear that the purpose of the presumption provided by 766.309(l)(a) is to aid a claimant in proving the prerequisite elements to a NICA claim. Notably, the statute provides a “rebuttable presumption.” Here, the Bennetts never invoked the presumption and, accordingly, that presumption, enacted for the benefit of claimants, never reached fruition. Stated otherwise, the precondition, “If the claimant has demonstrated ...,” did not arise. The presumption, adopted to aid claimants, should not be invoked to obliterate the Bennetts’ position in this case that NICA does not apply to Tristan’s injuries. I conclude that this statutory presumption may not be applied against a party for whom the presumption may have been intended, but who has affirmatively elected to reject the benefits of the presumption.
Bennett, 27 So.3d at 72 (Kahn, J., dissenting).
Based on our analysis of the statutory scheme, the definition of “claimant,” and the prior legislative enactment, we conclude that a party seeking to restrict an individual to compensation under the NICA Plan cannot invoke the statutory rebuttable presumption against an individual who is seeking recovery outside of the NICA statute. In other words, if a claimant seeks benefits under the NICA Plan and demonstrates the statutory prerequisites, a rebuttable presumption of compensation will arise in his or her favor. In this case, we approve the ALJ’s construction of the statutory presumption and disapprove the First District’s contrary reasoning.
In addition to incorrectly interpreting the applicability of the statutory presumption, the First District never addressed the ALJ’s alternative finding that even if the rebuttable presumption applied, “there was credible evidence produced (in Tristan’s medical records) to support a contrary conclusion, and to require resolution of the issue without regard to the presumption.” 29 F.A.L.R. at 3879. That is, the ALJ properly determined that the presumption was “rebuttable” and therefore *846 once credible contrary evidence was produced, the presumption disappeared.
This is, in fact, consistent with how the rebuttable presumption serves to operate. Pursuant to Florida Statute, section 90.302 states:
Every rebuttable presumption is either:
(1) A presumption affecting the burden of producing evidence and requiring the trier of fact to assume the existence of the presumed fact, unless credible evidence sufficient to sustain a finding of the nonexistence of the presumed fact is introduced, in which event, the existence or nonexistence of the presumed fact shall be determined from the evidence without regard to the presumption; or
(2) A presumption affecting the burden of proof that imposes upon the party against whom it operates the burden of proof concerning the nonexistence of the presumed fact.
§ 90.302, Fla. Stat. (2001). All the parties agree that the statutory presumption at issue in this case is the type described in section 90.302(1), also known as the “bursting bubble” presumption. See Dep’t of Agric. & Consumer Servs. v. Bonanno, 568 So.2d 24, 31 (Fla.1990). Therefore, the ALJ was also correct in his alternative holding that the presumption disappeared because credible, contrary evidence was introduced to rebut the presumption, thereby returning the burden of proof to the respondents to prove that the claim was covered by the NICA Plan.

IV. Competent, Substantial Evidence Supports the ALJ’s Decision

The respondents next contend that even if the rebuttable presumption does not apply or the presumption was rebutted, competent, substantial evidence does not support the ALJ’s decision in this case. Section 766.311(1), Florida Statutes (2001), provides that an ALJ’s determination as to the qualification of the claim for purposes of compensability “shall be conclusive and binding as to all questions of fact.” On appeal, an ALJ’s findings of fact are upheld if supported by competent, substantial evidence. Fla. Birth-Related Neuro. Injury Comp. Ass’n, 686 So.2d at 1356; see also Pediatrix Med. Grp. of Fla., Inc. v. Falconer, 31 So.3d 310, 312 (Fla. 4th DCA 2010).
The Bennetts produced expert testimony and medical records to show the injury occurred outside of the time period contemplated by statute. The ALJ in this case relied significantly upon the fact that according to Tristan’s medical records, Tristan did not exhibit any signs or symptoms of neurological damage until after the October 3 incident. In fact, the extensive inedical records from St. Vincent actually reflected the opposite — with specific comments stating that on September 28, her “[njeuro [was] grossly intact”; on September 29, her “[njeuro [was] Active Alert”; on September 30, there was “[n]o evidence of CNS [central nervous system dysfunction] at present”; on October 1, her “[n]euro [was] grossly intact” and there were no central nervous system abnormalities noted; and on October 2, there were “[n]o focal neuro deficits, Active & Alert ... CNS: No obvious neuro abnormalities” noted. On October 3, however, Tristan suffered from a pulmonary hemorrhage, was not breathing at times, and had a very low heart rate and oxygen saturations. She was critically unstable through most of the day and began showing the onset of seizure activity, which may indicate central nervous system dysfunction. From this point forward, physician progress notes documented additional neurological abnormalities, leading to neurological testing. Specifically, on October 4, she had a possible seizure and the note in her record stated that she had not suffered obvious central nervous system (CNS) dysfunction until the prior night. On October 5, she *847 had CNS tremors and an EEG was ordered, as well as a pediatric neurological consultation with Dr. Gama. EEGs were performed on October 5, October 8, October 17, and November 2, and showed abnormalities. A CT scan, which was performed on October 29, showed multicystic encephalomalacia of the cortex. The ALJ reviewed all of the medical records and expert testimony, but noted that none of the parties offered the testimony of a neurologist or neonatologist to address the likely timing of the brain injury, apart from the observations of the health care providers who were involved in Tristan’s care.
Relying on the medical records and the testimony of the doctors and other witnesses, the ALJ found that it was more likely than not that the injury did occur on October 3. The medical providers do not dispute the facts relied upon by the ALJ in making these determinations, but instead focus their argument on assertions that the ALJ is not qualified to review Tristan’s medical records in making his conclusions and that their expert was more qualified to render an opinion regarding the timing of the injury. However, the experts and medical records are all relevant evidence to be considered. The respondents are simply disputing the weight to be given such evidence and testimony.
Because the ALJ’s findings of fact are supported by competent, substantial evidence, we conclude that the ALJ’s order finding that the claim is not compensable under the NICA Plan is legally and factually correct.
CONCLUSION
Accordingly, we hold that in order for a “birth-related neurological injury” to occur, the injury to the brain caused by oxygen deprivation, which renders the infant permanently and substantially impaired, must occur during labor, delivery or resuscitation in the immediate postdelivery period. That period does not encompass an additional “extended period of time when a baby is delivered in a life-threatening condition” unless there are ongoing and continuous efforts of resuscitation. Both the incident of oxygen deprivation and the brain injury resulting from the oxygen deprivation must occur in this time period. Further, regarding the statutory presumption, only the individual seeking compensation under the NICA Plan is entitled to the benefit of the statutory presumption. Based on our analysis, we approve the analysis in Orlando Regional to the extent that it is consistent with this decision, quash the First District’s decision below, and remand to the First District with directions to affirm the ALJ’s final order.
It is so ordered.
LEWIS, LABARGA, and PERRY, JJ„ concur.
QUINCE and POLSTON, JJ., concur in result.
CANADY, C.J., dissents with an opinion.

. We consolidated the two separate cases for oral argument and now consolidate the cases for purposes of this opinion since both cases arise out of a single appellate decision and a single set of facts.

. An Apgar score is a numerical expression of the condition of the newborn and reflects the sum total of points gained on an assessment of heart rate, respiratory effort, muscle tone, reflex irritability, and color. See Nagy v. Fla. Birth-Related Neuro. Injury Comp. Ass’n, 813 So.2d 155, 156 n. 1 (Fla. 4th DCA 2002) (citing Dorland’s Illustrated Medical Dictionary 1498 (27th ed. 1988)).

. See § 766.303(2), Fla. Stat. (2001) (stating that the rights and remedies granted under the NICA Plan exclude all other rights and remedies).

. We exercise our discretion to consider this issue although it is not within the scope of the conflict. See PK Ventures, Inc. v. Raymond James & Assocs., Inc., 690 So.2d 1296, 1297 n. 2 (Fla.1997) ("Once a court obtains jurisdiction, it has the discretion to consider any issue affecting the case.”).